[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1176 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1177 
This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to me on February 15, 1999. Although I was not a member of this Court when this case was orally argued, I have reviewed the recorded audiotapes and videotapes of the argument.
Aaron Lee Jones appeals from the denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P, challenging his 1982 conviction for capital murder. Jones was originally convicted of murder made capital because two or more human beings were intentionally killed by one or a series of acts. He was sentenced to death in 1979. See § 13-11-2(a)(10). This court, however, reversed the trial court's judgment and ordered a new trial pursuant to Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and Ritter v. State, 403 So.2d 154
(Ala. 1981). See Jones v. State, 403 So.2d 1 (Ala.Cr.App. 1981). Jones was retried, and on December 10, 1982, he was again convicted of capital murder and sentenced to death. After remanding Jones's case for the trial court to clarify whether it had found any mitigating circumstances and whether the aggravating circumstances outweighed the mitigating circumstances, this Court, on January 22, 1985, affirmed Jones's conviction and sentence of death. Jones v. State, 520 So.2d 543 (Ala.Cr.App. 1985). The Alabama Supreme Court affirmed this court's judgment on January 8, 1988. Ex parte Jones, 520 So.2d 553 (Ala. 1988). On October 3, 1988, the United States Supreme Court denied certiorari review.Jones v. Alabama, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151
(1988). On March 6, 1990, Jones filed a Rule 32 petition attacking his conviction and sentence. On May 13, 1995, Jones supplemented his original petition with an amended petition. The trial court held an evidentiary hearing on the allegations in Jones's petition on November 13-14, 1995, and, in a thorough 30-page order, denied all relief on June 10, 1996.
The essential facts of this case were recited by this court in Jones v. State, supra:
 "Tony Nelson testified that on the morning of November 10, 1978, he was sleeping with his ten-year-old brother, Charlie, in one of the bedrooms of his parents' home in the Rosa community in rural Blount County, Alabama. His thirteen-year-old sister, Brenda, was sleeping with their parents, Willene and Carl Nelson, in another bedroom. Tony's grandmother was sleeping by herself in a third bedroom of the home.
 "At 3:27 a.m. Tony was awakened by a disturbance inside the home. When the light in his bedroom was turned on, he saw Arthur Lee Giles, a former employee of his father, standing in the doorway of Tony's bedroom. Tony's father appeared and asked Giles to leave. Tony got out of bed and followed Giles to make sure Giles left as directed. As Tony stepped out the back door of the home Giles shouted `here,' and shot him twice, once in the neck and once in the chest. Giles, then, re-entered the Nelsons' home. Tony made an effort to go and get a gun, but was unable to do so due to his injuries. Instead, he crawled to, and hid under, his father's truck. Shortly, thereafter, he heard Giles and another man exit his parents' home. He saw the men only from the waist down. He heard one of them say that they needed to find Tony and that the other man should `get the money.' After they left, Tony went back inside. In his parents' bedroom he found his mother, his father, his sister, and his brother. All four had been severely wounded and there was blood all over them. Charlie and Brenda responded when Tony asked if anyone was still alive. His parents were dead. Tony rushed Brenda and Charlie to the hospital where all three, *Page 1179 
including Tony, were treated for their wounds.
 "Charlie Nelson testified that he saw Giles when his father, Carl Nelson, asked Giles to leave the home. He saw Tony leave and heard two gunshots. Giles, then, reappeared and shot Charlie's grandmother, who was standing in the doorway to Charlie's bedroom. Giles proceeded to Charlie's parents' bedroom from where Charlie heard more gunshots. Charlie ran to his parents' bedroom, where he saw Giles and another man, whom he positively identified at trial as the appellant. He realized that his mother, his father and his sister had all been shot. He jumped on top of his sister to protect her from further harm. As he lay there, he saw the appellant stab his mother and father with a knife. His mother and father were both moaning as the appellant repeatedly stabbed them. The appellant turned and stabbed Charlie's sister Brenda, who had already been shot above one eye. Charlie was hit in the head several times, after which the appellant stabbed him twice in the back.
 "On cross-examination Charlie admitted that during appellant's first trial Charlie had stated that Giles and the appellant appeared to be drunk. He also stated that Giles `ordered the appellant around' and directed the appellant to stab his victims.
 "Brenda Nelson confirmed those parts of Tony's and Charlie's testimony as to things she had witnessed. She identified the appellant at trial as the man she saw repeatedly stabbing her mother. She stated that Giles was the one that shot her, Brenda, in the head.
 "Dr. Joseph Embry of the Alabama Department of Forensic Science testified that Willene Nelson died from multiple stab wounds that damaged her heart, lungs, and kidneys. Her body received 29 knife wounds (17 stab wounds and 12 slash wounds), numerous lacerations and abrasions about the head from a blunt instrument, and one gunshot wound to the left shoulder. Dr. Embry testified that Carl Nelson died from a combination of gunshot wounds and stab wounds. He was shot once through the heart and once in the left arm. He was stabbed, approximately, eight times, including a stab wound in the neck which severed his spinal cord. He also received numerous blunt instrument abrasions about the head. Dr. Embry testified that Carl Nelson was alive when he was stabbed in the neck.
 "Billy Irvin, an investigator with the Blount County Sheriff's Department, testified that he interviewed the appellant at 8:15 a.m. on November 11, 1978. During this interrogation the appellant confessed to his participation in the events at the Nelsons' home the previous night. Appellant's confession was tape recorded and transcribed. The appellant reviewed the transcript of his confession and signed it, voluntarily. After the trial court conducted a hearing and determined that appellant's confession was, indeed, voluntary, Irvin was permitted to read it to the jury.
 "In appellant's statement, he admitted participating in the activities that resulted in the deaths of Willene and Carl Nelson. According to the appellant, although they never found any money, he and Giles went to the Nelsons' home to rob Carl Nelson. Giles had told the appellant that Carl Nelson had not sufficiently paid Giles for work Giles had done for Nelson in the past. Giles and the appellant had been drinking rum and beer prior to their trip to the Nelsons' home. They were both armed with .32 caliber pistols, but appellant's pistol would not fire at the Nelsons' home because he lost the firing pin. The appellant's statement confirmed the gruesome details of the attack on the Nelson family. He stated that by the time he entered the back bedroom, Giles had already shot and stabbed `everyone.' In his own words the appellant stated: *Page 1180 
 "`I goes off in the other room where he [Giles] at . . . shot and stabbed them all there, you know, the kids and . . . he looks at me and tells me, you know, that I had to do something and I told him that I didn't have a knife so he gave me one and I cut the mother and another man and cut the boy and that's all I did.'
 "The appellant further stated that he used a butcher knife that Giles had, apparently, obtained from inside the Nelsons' home. He also said that the `little girl' at one point begged him not to do it, and that the `woman' moved right before he stabbed her. The appellant explained that when he stabbed the `woman' he `really was just so gone, I just closed my eyes' and stabbed wildly.
 "Although his confession was admitted into evidence, the appellant did not testify in his own behalf at trial, except during the suppression hearing on the issue of the voluntariness of his confession. In defense, he presented excerpts of the transcribed testimony, from his first trial, of several state's witnesses for impeachment purposes. He also presented his alleged accomplice, Arthur Lee Giles, who invoked his Fifth Amendment rights, and refused to testify. Appellant's theory in defense was that his participation in the double murder fell short of capital murder because Giles did all the actual killing and he, the appellant, only did what Giles instructed him to do.
 "The jury found the appellant "guilty as charged in the indictment" and the trial court, in accordance with the jury's recommendation, sentenced the appellant to death by electrocution."
520 So.2d at 545-46.
Initially, we note that on direct appeal all issues were scrutinized, including those issues reviewable only under the "plain error" doctrine. There is no plain error review in an appeal from the denial of a Rule 32 petition.
 I.
Jones claims that the trial court erred in adopting the State's proposed findings of fact and conclusions of law in its order denying his Rule 32 petition. Jones specifically asserts that adopting the State's findings was error, because, he says, those findings ignored evidence, made questionable credibility choices, and provided no independent analysis by the trial court. We note that Jones's challenge of the trial court's order is general and provides no specific examples of incorrect findings or misinterpreted evidence.
 "While the practice of adopting the state's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App. 1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App. 1989), cert. denied, [498] U.S. [882], 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr.App.), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990)."
Bell v. State, 593 So.2d 123, 126 (Ala.Cr.App. 1991), cert. denied, 593 So.2d 123 (Ala.), cert. denied, 504 U.S. 991,112 S.Ct. 2981, 119 L.Ed.2d 599 (1992).
Our review of the record supports the findings of the trial court's order. The findings and conclusions of the trial court, even if they were initially drafted by the State, present a fair and accurate statement and analysis of the evidence presented to the trial court.
Moreover, the record reflects that the trial court was thoroughly familiar with the case. After reviewing the record in this case, we find no reason to doubt that the trial court's order denying Jones's postconviction relief represents the trial court's independent judgment and its considered *Page 1181 
conclusions. Therefore, we find that the trial court's findings of fact and conclusions of law are supported by the evidence and are not clearly erroneous.
 II.
In his petition, Jones presented numerous claims regarding the performance of his trial counsel, most alleging acts and omissions of his counsel during their preparation for trial and at trial, which, he said, violated his rights guaranteed by the laws and Constitution of Alabama and the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Jones claims that as a result of his trial counsel's errors he was denied effective assistance of counsel.
 "In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
 "`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'
"466 U.S. at 687, 104 S.Ct. at 2064.
 "`The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under "prevailing professional norms," was "reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala.Cr.App. 1994), cert. denied, 488 U.S. 1051, 109 S.Ct. 884, 102 L.Ed.2d 1007 (1995), quoting Strickland, 466 U.S. at 688, 104 S.Ct. at 2065. `A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.' Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
 "The claimant alleging ineffective assistance of counsel has the burden of showing that counsel's assistance was ineffective. Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). `Once a petitioner has identified the specific acts or omissions that he alleges were not the result of reasonable professional judgment on counsel's part, the court must determine whether those acts or omissions fall "outside the wide range of professionally competent assistance." [Strickland,] 466 U.S. at 690, 104 S.Ct. at 2066.' Daniels, 650 So.2d at 552. When reviewing a claim of ineffective assistance of counsel, this court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala.Cr.App. 1992), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 491 (1994); Luke v. State, 484 So.2d 531 (Ala.Cr.App. 1985). `This court must avoid using "hindsight" to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance.' Hallford, 629 So.2d at 9. See also, e.g., Cartwright v. State, 645 So.2d 326 (Ala.Cr.App. 1994).
 "`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, *Page 1182 
examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
 "Strickland, 466 U.S. at 689, 104 S.Ct. at 2065 (citations omitted). See Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987).
 "`Even if an attorney's performance is determined to be deficient, the petitioner is not entitled to relief unless he establishes that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Strickland,] 466 U.S. at 694, 104 S.Ct. at 2068.'
"Daniels, 650 So.2d at 552.
 "`When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'
 "Strickland, 466 U.S. at 697, 104 S.Ct. at 2069, quoted in Thompson v. State, 615 So.2d 129, 132 (Ala.Cr.App. 1992), cert. denied, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418
(1993).
 "In a Rule 32 proceeding, the petitioner has `the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.' Rule 32.3, Ala.R.Crim.P. See Fortenberry v. State, 659 So.2d 194
(Ala.Cr.App. 1994), cert. denied, 516 U.S. 846, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); Wilson v. State, 644 So.2d 1326
(Ala.Cr.App. 1994); Elliott v. State, 601 So.2d 1118
(Ala.Cr.App. 1992)."
Bui v. State, 717 So.2d 6, 12-13 (Ala.Cr.App. 1997), cert. denied,717 So.2d 6 (Ala. 1998).
Moreover, "[a] finding of no plain error is one factor to consider when assessing the performance of counsel." Fortenberry,659 So.2d 194, 200 (Ala.Cr.App. 1994), quoting Hallford, 629 So.2d 6,10 (Ala.Cr.App. 1992).
Jones was represented at trial and on appeal by Jack G. Davis, now deceased, and George M. Boles. Boles testified at the evidentiary hearing. In his testimony, Boles indicated that he became involved in Jones's case a few days before Jones's trial at Davis's request. Boles was to try to negotiate a plea agreement with the State. Boles testified that he did in fact negotiate a plea agreement in which the State agreed to recommend a sentence of life imprisonment without parole, if Jones pleaded guilty. According to Boles, Jones unequivocally rejected the State's offer and insisted that he was innocent. When Boles informed the trial court that Jones had rejected the plea agreement, the trial court appointed Boles as co-counsel and insisted that the trial commence. On appeal, Jones argues that the root of his ineffective-assistance-of-counsel claims is what he says are Boles's racist views. *Page 1183 
However, in light of the circumstances surrounding Boles's appointment as Jones's counsel, we believe many of the claims are the result of Boles's late appointment as counsel to this case. Additionally, we note that evidence of the adequacy of the investigation conducted before trial was sparse because it was conducted by Davis, who at the time of the hearing on the Rule 32 petition was deceased. Finally, it also appears from Jones's brief on appeal, the trial court's order, and the transcript of the hearing, that at the hearing Jones abandoned most of the claims in his petition. Consequently, we will address only those issues Jones raises on appeal.
 A.
Jones contends that the trial court erred in finding that his trial counsel had prepared and presented a reasonable and coherent defense, based on their knowledge of the case. Specifically, he argues that the trial court "misapprehended the true nature of Mr. Jones's claim that counsel failed adequately to develop a reasonable defense theory." (Appellant's brief at p. 15.) At the Rule 32 hearing, an expert witness testified that based on his review of the medical records, it was his opinion that the victims were dead when Jones stabbed them. Jones argues that his trial counsel should have investigated thoroughly the timing of the allegedly fatal blows inflicted by Giles and compared those Jones admitted inflicting in his statement. Jones further claims that evidence "(1) that before he inflicted any wounds both victims were already dead and (2) that [consequently] he did not and could not form the intent required for a conviction of capital murder" was available to his trial counsel at the time of his trial and could have been used to show that he did not kill two or more persons pursuant to one course of conduct and that he did not have the necessary intent to kill.
The trial court found as follows with regard to this claim:
 "Jack Davis participated in the first trial and was co-counsel to Mr. Roundtree. Having participated in the prior trial, Davis was intimately acquainted with all the facts, circumstances, and evidence necessary to adequately represent Jones in 1982. At trial in 1982, Davis and Boles presented a reasonable, coherent defense of Jones. It is evident from the record that Jones denied any involvement in the murders. Instead, he claimed that he was present but did not inflict any knife wounds or gunshot wounds to the victims. The State's case depended upon the statements of the Nelson children who were surviving victims, and the confession of Jones. Boles aggressively attacked the witnesses' versions of events. Counsel impeached Brenda Nelson with prior inconsistent statements that she had made. In fact, counsel had admitted prior inconsistent statements over the objections of the State and prevented the State from admitting into evidence the entirety of her statements. Counsel also vigorously opposed the admission of Jones's confession during the hearing on their motion to suppress and during the testimony of the State's witnesses before the jury. Review of Mr. Davis's and Mr. Boles's examination of witnesses at trial confirms that both trial counsel were well prepared and were knowledgeable of all the facts and circumstances of the crime.
 "Petitioner now, in [a] Rule 32 [petition], presents a different defense theory and strategy to this Court. That strategy and defense is that Jones was at the scene of the murder, was asked to enter the house after the co-defendant Giles had shot and stabbed the victims, and that Jones, at Giles's command, stabbed the victims. Although he stabbed the victims, petitioner now claims that evidence shows that Carl and Willene Nelson were deceased at the time he inflicted the wounds on their bodies; therefore, this is evidence of Jones's lack of intent to commit murder. The presentation of this new theory is *Page 1184 
no more than second-guessing trial counsel's performance after petitioner's conviction and adverse sentence when the defense at trial proved to be unsuccessful. This is the situation of which Strickland warned.
 "Under the circumstances, and evaluating the conduct of counsel and their perspective at the time of the challenged conduct, it is clear, based upon the first trial and the statements of Jones during his sentencing in the first case (CR 27, 28, 30, 31), that Jones was denying that he inflicted any wounds whatsoever on the victims. It is clear from his statements to the trial court concerning his attorney that this was his plea and that he was dissatisfied with his attorney, Mr. Roundtree, for trying to present a mental health defense. The record also shows that petitioner alleged that his confession was only made because of promises made by the sheriff's department concerning bond and that the statement was not true but that he was coerced into making it. It would have been unreasonable for counsel to argue before the jury the alternative, contradictory theory that petitioner now presents before this Court.
 "Under the circumstances that existed at the time of trial, counsel could not have presented the defense not offered, and therefore was not ineffective for not developing the strategy concerning the timing of the fatal blows and the blows that petitioner now argues that he did inflict. Trial counsel had the benefit of hindsight from the first trial in which to prepare and try the 1982 case for petitioner. This Court, however, may not indulge in hindsight in its scrutiny of trial counsel's conduct."
(C.R. 1044-46.)
The trial court's findings, which are supported by the record, indicate that it understood Jones's defense at trial and that counsel, in light of their knowledge at the time of trial, presented a vigorous defense. As the trial court correctly noted, Jones's counsel had the benefit of Jones's 1979 trial, which led to a conviction and the imposition of a sentence of death, to assist in determining an appropriate defense to the evidence. Davis, one of Jones's counsel in the 1982 trial, represented Jones in the 1979 trial; therefore, he had knowledge of what defense tactics were effective based on the state's evidence, and what defenses, especially the one of nonparticipation raised in the 1979 trial, were not. Additionally, as the trial court found, Jones refused to engage in a plea bargain before the 1982 trial; that refusal indicated that he was not admitting any participation in the murders. Because the proposed theory of lack of intent would require Jones to admit participation in the acts, the theory presented in his Rule 32 petition is incongruent with Jones's actions and defense at trial. We have reviewed the record of Jones's direct appeal and agree with the trial court that Jones's counsel did an adequate job in developing a defense based on Jones's assertions at the time of the trial and the facts and circumstances of the case.
Moreover, in light of the evidence presented at trial, Jones's trial counsel may have made a strategic decision to not focus on the issue whether the victims were dead prior to Jones's participation. The victims were stabbed numerous times; there was testimony that the victims either moaned or moved while Jones was stabbing them. If the testimony Jones contends should have been used at trial, was used, Jones would have essentially admitted participation in the stabbings. Consequently, if the jury rejected the expert testimony that the victims were already dead when Jones stabbed them, the jury could only conclude that Jones killed the victims. Furthermore, the gravity of the eyewitness testimony that the victims lay groaning, which leads to the reasonable inference that the victims were alive before Jones stabbed them and while Jones was stabbing them, was an additional *Page 1185 
factor to consider in presenting such a defense.
Finally, we note that even if Jones did not inflict the fatal blows, he would still be guilty of capital murder as an accomplice. Based on the totality of the circumstances, we find that Jones has failed to establish prejudice and a reasonable probability that, but for trial counsel's actions in failing to present evidence that the victims were already dead before Jones's participation in the incident, the outcome of his trial would have been different. "Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable." Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987). We will refrain from the use of hindsight in evaluating trial counsel's decisions. See Hallford, 629 So.2d at 9; andState v. Tarver, 629 So.2d 14, 21 (Ala.Cr.App. 1993). See alsoCade v. State, 629 So.2d 38, 42 (Ala.Cr.App. 1993), cert. denied,511 U.S. 1046, 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994) (holding that "an attorney may reasonably decide to avoid presenting evidence [or a defense] that he believes will do more harm than good"). We agree with the trial court's ruling that Jones's counsel did not render ineffective assistance in this regard.
 B.
Jones argues that his trial counsel rendered ineffective assistance in failing to object to the trial court's jury charge on accomplice liability, failing to object to an allegedly burden-shifting charge on malice, and failing to request jury charges on voluntary intoxication and on manslaughter.
In order to reach the merits of Jones's claims of ineffective assistance of counsel with regard to the jury instructions, we must first address the underlying substantive issues.
When this Court conducts a review of the trial court's oral charge to the jury we do not look at a single jury instruction in isolation, but we must consider the instruction in the context of the overall charge. Any questioned language must be given a reasonable construction. Additionally, if a portion of the trial court's charge is erroneous, "`the entire . . . charge must be construed together to see if there was reversible error.'" Travisv. State, [Ms. CR-92-0958, April 19, 1997] ___ So.2d ___ (Ala.Cr.App. 1997), quoting Kuenzel v. State, 577 So.2d 474, 517
(Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
1. The trial court's charge on accomplice liability.
Jones argues that the trial court's instruction on accomplice liability was "clearly improper and erroneous because it failed to instruct the jury on the particularized intent to kill necessary to sustain a capital murder conviction." (Appellant's brief at pp. 20-21.)
The trial court instructed the jury as follows with regard to particularized intent and accomplice liability:
 "A person cannot be guilty of murder in the first degree under [§ 13-11-2(10), Ala. Code 1975][1] unless all four of these elements are present. First, he has to intend to take human life when he does the act. Second, he has to kill willfully. Third, he has to kill deliberately and with premeditation. And four, he must kill with malice aforethought. If any one of these four elements is absent, he is not guilty of murder in the first degree as set out in the statute defining murder in the first degree. In addition to being convinced beyond a reasonable doubt and to a moral certainty that the defendant committed murder in the first degree, as I have defined to *Page 1186 
you, it would also be necessary for the State of Alabama to prove beyond a reasonable doubt and to a moral certainty that at said time two or more human beings were intentionally killed by the defendant by one or a series of acts.
 "So to find the defendant guilty as charged, you would also have to find from the evidence beyond a reasonable doubt and to a moral certainty that the defendant did by one or a series of acts intentionally kill two or more human beings. If after consideration of all the evidence in the case, you are convinced beyond a reasonable doubt and to a moral certainty that the defendant is guilty of murder in the first degree, as I have explained to you, and if you are further convinced beyond a reasonable doubt and to a moral certainty that the defendant did at the same time and occasion intentionally kill two or more human beings by one or a series of acts as charged in the indictment, then it would be your duty to find the defendant guilty as charged.
 "Now, ladies and gentlemen, there has been some evidence offered in this case indicating that at the time and the place this alleged offense occurred there was more than one person who was present and participated in the act that was set out by the wording of the indictment. Under our law it is well established that when by pre-arrangement or on the spur of the moment two or more persons enter upon a common enterprise or a venture and a criminal offense is contemplated, each is a co-conspirator. And if the purpose was carried out, each is guilty of the offense committed whether he did any overt acts or not. This rests on the principle that one who is present, encouraging, aiding, abetting or assisting the other in the perpetration or commission of an offense is a guilty participant, and in the eye of the law is as equally guilty as the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. The jury is to determine whether that exists and the extent of it from the conduct of the parties and all the testimony in the case.
 "When two or more persons enter upon an unlawful purpose with the common intent to aid and encourage each other in anything within their common design, they are each responsible for everything which was consequently and subsequently the result from such unlawful purpose whether specifically contemplated or not."
(C.R. 685-88; R. on dir. app. 395-98.)
The trial court's instruction that the jury find that Jones had the requisite intent immediately preceded its instruction on accomplice liability. When read together, and especially in light of the fact that the instruction on accomplice liability immediately followed the trial court's instruction on the necessity of finding a particularized intent to kill, we find no reversible error in the trial court's charge to the jury. We acknowledge that the portion of the trial court's instruction that states, "they are each responsible for everything which was consequently and subsequently the result from such unlawful purpose whether specifically contemplated or not" may be confusing and may appear prejudicial. However, we believe, in light of the concreteness of the trial court's instruction on the finding of particularized intent and in light of the evidence, argument, and instructions presented at trial, the jury, even if it convicted Jones based on the theory of accomplice liability, found that Jones possessed the necessary intent to kill. Therefore, the trial court's instructions on intent and accomplice liability when given a reasonable construction in light of the facts adduced at trial did not constitute reversible error. Davis v. State, [Ms. CR-96-2341, May 29, 1998] 740 So.2d 1115 (Ala.Cr.App. 1998);Roberts v. State, [Ms. CR-93-1766, May 23, 1997] 735 So.2d 1244
(Ala.Cr.App. 1997); and George v. State, 717 So.2d 827
(Ala.Cr.App. 1996), rev'd on other grounds, 717 So.2d 844 (Ala. 1996). *Page 1187 
Because we find no reversible error in the trial court's instruction to the jury on accomplice liability and particularized intent, we cannot conclude that Jones's trial counsel was ineffective for not challenging these instructions. Counsel cannot be ineffective for failing to raise nonmeritorious objections.
2. The trial court's charge on malice.
Jones contends that the trial court committed reversible error when it instructed the jury on the element of malice, because, he says, the instruction created a "mandatory presumption" that relieved the state of its burden of persuasion of the element of malice and shifted that burden to him.
The trial court instructed the jury as follows:
 "Now, we have [a] statute which defines murder in the first degree. This statute says that every willful, deliberate, malicious and premeditated killing of a human being is murder in the first degree. Now I will undertake to define these four terms for you in order that you may better understand them, and in doing so, will use the language used by the Supreme Court many years ago.
 "Willful means governed by the will without yielding to reason. Deliberate means formed with deliberation in contradistinction to a sudden and rash act. Malice means done with a fixed hate or wicked intention or a motive, not the result of a sudden passion. That is the definition of actual malice. But the word malice, as used in this statute which defines murder, has a broader meaning than that. It includes, not only actual malice, but includes what we call legal or implied malice. And in the broader sense, it means the state or condition of the mind which prompted a person to do an unlawful act without legal justification or extenuation.
 "Now every intentional and unlawful killing of a human being is presumed to be done with malice aforethought unless the circumstances that surround the killing rebut the idea of malice. Every intentional and unlawful killing of a human being with a deadly weapon, such as a pistol or with a knife, is presumed to be done with malice unless the evidence that proved the killing rebuts the presumption of malice."
(C.R. on Rule 32 683-685.) (R. on dir. app. 393-95.)
This court has written:
 "`Inferences and presumptions are a staple of our adversary system of factfinding. It is often necessary for the trier of fact to determine the existence of an element of the crime — that is, an "ultimate" or "elemental" fact — from the existence of one or more "evidentiary" or "basic" facts. E.g., Barnes v. United States, 412 U.S. 837, 843-844 [93 S.Ct. 2357, 2361-62, 37 L.Ed.2d 380] [(1973)]; Tot v. United States, 319 U.S. 463, 467
[63 S.Ct. 1241, 1244, 87 L.Ed. 1519] [(1968)]; Mobile, J. K.C.R. Co. v. Turnipseed, 219 U.S. 35, 42 [31 S.Ct. 136, 137, 55 L.Ed. 78] [(1910)]. The value of these evidentiary devices, and their validity under the Due Process Clause, vary from case to case, however, depending on the strength of the connection between the particular basic and elemental facts involved and on the degree to which the device curtails the factfinder's freedom to assess the evidence independently. Nonetheless, in criminal cases, the ultimate test of any device's constitutional validity in a given case remains constant: the device must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364 [90 S.Ct. 1068, 1072, 25 L.Ed.2d 368] [(1970)]; Mullaney v. Wilbur, 421 U.S. [684,] at 702-703, n. 31 [95 S.Ct. 1881, 1891-92, n. 31, 44 L.Ed.2d 508] [(1975)]. *Page 1188 
 "`The most common evidentiary device is the entirely permissive inference or presumption, which allows — but does not require — the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and which places no burden of any kind on the defendant. See, e.g., Barnes v. United States, supra, [412 U.S.], at 840 n. 3 [93 S.Ct. at 2360 n. 3]. . . . Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the "beyond a reasonable doubt" standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference. For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.
 "`A mandatory presumption is a far more troublesome evidentiary device. For it may affect not only the strength of the "no reasonable doubt" burden but also the placement of that burden; it tells the trier that he or they must find the elemental fact upon proof of the basic fact, at least unless the defendant has come forward with some evidence to rebut the presumed connection between the two facts. E.g., Turner v. United States, [396 U.S. 398,] 401-402, and n. 1 [90 S.Ct. 642, 644-45, 24 L.Ed.2d 610 (1970)]; Leary v. United States, 395 U.S. 6, 30 [89 S.Ct. 1532, 1545, 23 L.Ed.2d 57] [(1969)]; United States v. Romano, 382 U.S. 136, 137, and n. 4, 138, 143 [86 S.Ct. 279, 280, and n. 4, 280, 283, 15 L.Ed.2d 210] [(1965)]; Tot v. United States, supra [319 U.S.], at 469 [63 S.Ct. at 1245]. In this situation, the Court has generally examined the presumption on its face to determine the extent to which the basic and elemental facts coincide. E.g., Turner v. United States, supra [396 U.S.], at 408-418 [90 S.Ct. at 648-53]; Leary v. United States, supra [395 U.S.], at 45-52 [89 S.Ct. at 1552-57]; United States v. Romano, supra [382 U.S.], at 140-141 [86 S.Ct. at 281-82]; Tot v. United States, 319 U.S., at 468
[63 S.Ct., at 1245]. To the extent that the trier of fact is forced to abide by the presumption, and may not reject it based on an independent evaluation of the particular facts presented by the State, the analysis of the presumption's constitutional validity is logically divorced from those facts based on the presumption's accuracy in the run of cases. It is for this reason that the Court has held it irrelevant in analyzing a mandatory presumption, but not in analyzing a purely permissive one, that there is ample evidence in the record other than the presumption to support a conviction. E.g., Turner v. United States, 396 U.S., at 407 [90 S.Ct., at 647]; Leary v. United States, 395 U.S., at 31-32 [89 S.Ct., at 1545-46]; United States v. Romano, 382 U.S. at 138-139
[86 S.Ct. at 280-81].'
 "Court of Ulster County, New York v. Allen, 442 U.S. 140, 156-60, 99 S.Ct. 2213, 2224-26, 60 L.Ed.2d 777 (1979) (footnotes omitted, emphasis in original)."
Beard v. State, 612 So.2d 1335, 1342-43 (Ala.Cr.App. 1992). See also Manuel v. State, 711 So.2d 507 (Ala.Cr.App. 1997).
Here, the predicate fact supporting the presumption is Jones's intentional and unlawful killings of the victims with a deadly weapon, i.e., a knife. The presumed fact that the jury was instructed to conclude from proof of the killings is that Jones committed the murders with malice aforethought. However, in order for the jurors to reach that conclusion, the State had to prove that Jones killed the victims intentionally and that the circumstances of the killings evidenced that Jones acted with malice aforethought. We do not find that the trial court's instruction shifted the *Page 1189 
State's burden to establish the element of malice to Jones. In this situation, the permissive presumption "`[did] not relieve the state of its burden of persuasion because the presumption still require[d] the state to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved.'" Beard, 612 So.2d at 1343, quoting Francis v. Franklin, 471 U.S. 307, 314, 105 S.Ct. 1965,1971, 85 L.Ed.2d 344 (1985).
Therefore, we conclude that the instruction could not reasonably be read, as Jones suggests, as instructing the jury that it was required to infer or presume the element of malice aforethought in the absence of evidence from Jones presented evidence that such a presumption was unwarranted. Consequently, we do not consider the trial court's instruction violative of the Due Process Clause of the Fourteenth Amendment, which "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364,90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Because we do not believe that a reasonable juror could have interpreted this instruction as relieving the prosecution of its burden of persuasion on each essential element of the charged capital murder, we find no error. Moreover, the trial court also gave a charge concerning the defendant's presumption of innocence and the State's burden of proof. Therefore, when considering the jury instruction in its entirety, the error, if any, was cured by the additional charges. Hubbard v. State, 584 So.2d 895
(Ala.Cr.App. 1991), cert. denied, 502 U.S. 1041, 112 S.Ct. 896,116 L.Ed.2d 798 (1992); Sims v. State, 386 So.2d 767
(Ala.Cr.App. 1980) (holding that trial court's instruction on malice did not shift the State's burden of proof to the defendant).
Because Jones has failed to establish that the trial court's instruction on malice constituted error, he has failed to show that his trial counsel was ineffective for failing to challenge this instruction.
3. Trial counsel was ineffective for failing to request a juryinstruction on the lesser included offense of manslaughter and onvoluntary intoxication.
a. Failure to request a jury instruction on manslaughter.
 "Generally, a trial court should instruct the jury on a lesser offense if there is a reasonable theory from the evidence to support that lesser offense. Ex parte Stork, 475 So.2d 623, 625 (Ala. 1985). However, a trial court may properly refuse to instruct on a lesser offense when it is `clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense.' Stork, 475 So.2d at 625. In this case, the trial court did not err in refusing the appellant's requested instruction on the lesser offense of manslaughter.
 "`For a jury to find that the appellant may have been guilty of manslaughter rather than murder, evidence would have had to have been introduced at trial which might have shown the appellant's conduct to have been "reckless" or triggered by "sufficient provocation." § 13A-6-3(a), Ala. Code 1975. If such evidence is introduced "however weak, insufficient, or doubtful in credibility," then the appellant is entitled to a jury charge on the lesser included offense. Ex parte Stork, 475 So.2d 623 (Ala. 1985); Anderson v. State, 507 So.2d [585] at 583 [(Ala.Cr.App. 1987)].'"
Jones v. State, 656 So.2d 414, 415 (Ala.Cr.App. 1994), quotingCarey v. State, 560 So.2d 1103, 1106 (Ala.Cr.App. 1989).
The evidence presented at trial did not support a jury instruction on manslaughter. This incident occurred during the early morning hours. Jones and his accomplice awakened a sleeping household. *Page 1190 
No evidence was presented that the victims had any weapons or that they provoked or attacked Jones, causing him to stab them multiple times. The evidence tended to show that after the victims had been shot by his accomplice, Jones stabbed the victims repeatedly, and that they were moaning while he was stabbing them. Additionally, there was no evidence that Jones's conduct was reckless. Jones's theory of defense was that his participation in the murders fell short because his accomplice did the actual killing and he did only what his accomplice instructed him to do. This theory does not place the element of intent at issue. Such conduct under the facts in this case is consistent with intentional, not reckless conduct. Finally, by his conduct before his second trial and his unwillingness to enter a plea agreement, Jones was obviously denying any participation in the murders. He clearly did not believe that his mental state was an issue. Therefore, we find that the evidence did not support a charge of manslaughter.
b. Failure to request a jury instruction on voluntaryintoxication.
Likewise, the evidence presented at trial failed to support a jury instruction on voluntary intoxication. Evidence was admitted in the form of Jones's statement to law enforcement officers in which he admitted that he and Giles had been drinking rum and beer before going to the victims's house; however, such an admission does not prove that he was intoxicated. Windsor v. State,683 So.2d 1027 (Ala.Cr.App. 1994), aff'd, 683 So.2d 1042 (Ala. 1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545
(1997). Additionally, although Charlie Nelson testified that Jones and his accomplice seemed "drunk" and although Jones admitted in his statement that he "was just so gone," when he stabbed the victims that he just closed his eyes and stabbed wildly, none of the evidence presented at trial indicated that he was so intoxicated that he could not form the requisite intent to sustain a conviction for murder. Coon v. State, 494 So.2d 184,188 (Ala.Cr.App. 1986); Lawrence v. State, 341 So.2d 188, 193
(Ala.Cr.App. 1977) (holding "that voluntary drunkenness is not a defense to a criminal charge unless it is so extreme as to render impossible some mental condition which is an essential element of the criminal act"). The evidence here simply does not support such a charge.
At his Rule 32 hearing and on appeal, Jones contends that his trial counsel was ineffective for not presenting evidence that he was intoxicated at the time of the murders. Jones argues that the testimony of Glen Jones, his sister, would have established that he was intoxicated at the time of the murders. We agree with the trial court, however, that counsel made a strategic choice not to present this defense and not to call Glen Jones as a witness in the 1982 trial. Glen Jones testified during the 1979 trial. In her testimony she admitted that she allowed Jones to "shoot up" with drugs while her children were in her house. In addition to her character being challenged, her testimony was impeached and, consequently, led to the implication that Jones's accomplice did not have to coerce Jones to participate in the murders. As the trial court stated,
 "It is easy to see why counsel would be reluctant to call Glen Jones for the second trial after hearing her testimony from the first trial. . . . Since petitioner was convicted in his 1979 trial, trial counsel in the 1982 trial had good reason to avoid using Glen Jones as a witness. . . . In reviewing the testimony of Glen Jones, this Court is of the opinion that it was a sound strategic decision of trial counsel not to present Glen Jones as a witness at trial."
(C.R. 1059-60.) Jones's trial counsel had knowledge of the previous trial and of the effectiveness at that trial of the testimony of various witnesses, especially the testimony of Glen Jones. Based on our review of the first trial, we cannot say that it was error for trial counsel not to present testimony *Page 1191 
from Glen Jones to establish Jones's intoxication, in light of the questionable credibility of her testimony in the previous trial. "`[I]f an attorney is aware of a line of defense and makes a conscious decision to reject it, rather than failing to raise it simply because he was aware that it existed, it is more likely that the failure to raise the defense was reasonable.'" Cade v.State, 629 So.2d at 41-42, quoting, Gates v. Zant, 863 F.2d 1492,1498 (11th Cir.), cert. denied, 493 U.S. 945, 110 S.Ct. 353,107 L.Ed.2d 340 (1989). Therefore, because trial counsel made a strategic choice not to present an intoxication defense, we do not conclude that Jones's trial counsel was ineffective for not presenting evidence of his voluntary intoxication, nor do we find error in their failure to request a charge on voluntary intoxication — the evidence simply did not support it.
Based on the foregoing, Jones's trial counsel was not ineffective for failing to request jury instructions on manslaughter and on voluntary intoxication. Those instructions were not supported by the evidence and the theory of the defense.
 III.
Jones contends that his trial counsel rendered ineffective assistance during the sentencing phase of his trial because, he says, his counsel failed to investigate and to present available mitigating evidence. Specifically, he maintains that his trial counsel could have provided testimony concerning his mental health, evidence that he did not deliver the fatal blows to the victims, and testimony from family members and friends about his background that would have been useful as mitigation. At Jones's trial the only evidence presented by the defense during the sentencing phase was Jones's testimony in his own behalf about a prior conviction.
While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, "this duty only requires a reasonable investigation." Singleton v. Thigpen,847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019,109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). SeeStrickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v.State, 551 So.2d 435 (Ala.Cr.App. 1989), cert. denied, 495 U.S. 911,110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel's obligation is to conduct a "substantial investigation into each of theplausible lines of defense." Strickland, 466 U.S. at 681,104 S.Ct. at 2061 (emphasis added). "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made." Id., 466 U.S. at 686,104 S.Ct. at 2063.
 "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."
Id., 466 U.S. at 691, 104 S.Ct. at 2066.
On appeal Jones argues that the trial court erred in rejecting the following mitigating evidence, which he presented at his Rule 32 hearing, in support of his allegations that counsel was ineffective for not presenting this evidence at his trial.
1. Evidence that Jones was and is severely mentally ill.
Jones claims that his trial counsel was ineffective for failing to present mitigating evidence that he was and is mentally ill, that he suffers from organic brain damage, that he is a dependent personality and easily coerced, that he suffered from multi-substance abuse and experienced "toxic psychosis" on the night of the murders, and that he suffers from dysthymia, anti-social personality disorder, and borderline mental functioning. *Page 1192 
With regard to this claim, the trial court entered the following findings of fact:
 "At the evidentiary hearing, Petitioner presented the testimony of Dr. Brad Fisher, an expert in clinical forensic psychology. (Evidentiary hearing R. 284). Dr. Fisher testified that petitioner suffered at the time of the crime and continues to suffer from significant mental conditions. These mental conditions are (1) dependency and suggestibility, (2) multi-substance abuse, (3) organic impairment, and (4) major thought disorder. (Evidentiary Hearing R. 293-294). In forming his opinion, Dr. Fisher reviewed medical records, prison records, affidavits of family members, prior court records and [conducted] an evaluation of the petitioner. Additionally, he interviewed the family members. The evaluation of petitioner was conducted during a seven- to eight-hour period on November 30 and December 1 of 1994. On November 30, 1994, he interviewed petitioner's mother, Martha Erby and interviewed other family members on the 12th of November 1995, the Sunday before the evidentiary hearing in this matter. That interview included interviews with petitioner's mother; with his sister, Glen Jones; his brother, Henry Erby; his sister, Phyllis Faevers; his uncle, Johnny Wright; and his niece, Barbara Jones. (Evidentiary Hearing R. 289-290).
 "The prison record consisted of depositions from Dr. Thomas L. Smith and Dr. James C. Thompson in 1979, including the 1979 evaluation by Drs. Thompson and Smith done at Bryce Hospital and the medical records from petitioner's stay in prison.
 "The record reflects that counsel for petitioner investigated and pursued a mental health defense for the first trial. Petitioner had been evaluated by the Lunacy Commission. Previous counsel, during the first trial, had filed appropriate motions for mental evaluations and had conducted depositions of the mental health experts who evaluated petitioner. The trial court subsequently denied the motion for private psychiatric examination and testing and funds for an expert witness in the field of mental health to perform intelligence and personality tests on the petitioner. (C.R. 204-205). Thereafter, petitioner was granted his right to refile his motion for psychiatric examination and said motion was granted. (C.R. 106).
 "Subsequently, in preparation for the second trial, Jack Davis filed a motion for expert witnesses including mental health experts and filed a motion for private psychiatric examination and testing. (CR. 204-205). That was denied by the Court on December 7, 1982. (CR. 205). This Court finds that counsel in the 1982 trial filed the appropriate motions requesting mental health experts and the appropriate evaluations and tests to be performed upon petitioner and was denied relief by the Court. Petitioner claims that Davis and Boles did not adequately present the testimony available to them as to the mental health of the petitioner and had they presented the available information, they would have been allowed to present the testimony before the jury.
 "This Court, after having reviewed the records that were reviewed by Dr. Fisher, the testimony of witnesses and the depositions submitted by both parties of the prison physicians that treated the petitioner, finds that the basis for Dr. Fisher's opinion is questionable.
 "The first area of doubt is the diagnosis of psychosis. It appears that the original diagnosis was made by Dr. Richard Cooksey, a general practitioner for inmates in the prison system. On October 17, 1991, he examined the petitioner for weight loss. Petitioner had a weight-loss problem and Dr. Cooksey, not finding a physical reason for the problem, doubted an organic basis for weight loss and felt that the weight loss was a result of the petitioner just not *Page 1193 
eating. Petitioner told him that he would not eat anything on his tray if the tray came in contact with anything "unclean." Although in his records he wrote that petitioner admitted auditory hallucinations, the doctor admitted that they were poorly described at the time. (Page 21, Deposition of Dr. Cooksey). The doctor could remember nothing about the nature of the hallucinations. Admitting that he was not a psychiatrist, the doctor stated, `If he is not eating, he's psychotic. That's pretty much normal day-to-day functioning, eating.' (Page 22, Deposition Dr. Cooksey). When asked what percentage of inmates whom he saw at Donaldson Correctional Facility did he believe to be psychotic, he stated that it was common enough where it doesn't really stand out at that institution, inferring that he believed many of the inmates he saw were psychotic. (Pages 24-25, Deposition Dr. Cooksey). He made notes reflecting his diagnosis of petitioner in the medical records of petitioner and recommended that petitioner would be best served at Kilby Correctional Institution where he would get treatment for his mental [illness].
 "Two psychiatrists treated the petitioner during his stay in prison, Dr. Blankenship and Dr. Joseph. From their depositions and from the record it appears that these doctors did not perform any individualized testing or evaluations of petitioner. Most examinations were routine and consisted of asking a series of form questions to which the petitioner would answer. The interviews were short, usually about eight minutes in length. They read the `diagnosis' of Dr. Cooksey and treated petitioner for psychosis by giving him Haldol for his reported hallucinations. These doctors also could not describe specific hallucinations. Therefore, even though the medical records indicate some sort of mental health history, including earlier records of the Lunacy Commission, this Court concludes that there has been no reasonable dependable diagnosis of psychosis to support the opinion of Dr. Fisher, and indeed it appears to this Court that there is no evidence of psychosis.
 "Although Dr. Fisher states that his testing showed that there is some organicity in the psychosis and other mental problems of the petitioner, there is no evidence to support this opinion. Dr. Fisher admitted that he could not obtain closure on this issue. This Court notes that it allowed the petitioner to be tested for any organic basis for mental health problems. Petitioner was transported to a facility which could perform the tests, but no test results or testimony was presented to this Court as to the result of those tests. Therefore, this Court concludes that there is no evidence of an organic basis for any mental health problems the petitioner might have.
 "The diagnosis of low intelligence is rebutted by testimony of family members who stated the petitioner did well in school and no evidence was presented to contradict that. Although the petitioner quit school before he graduated, he did later obtain his GED, which rebuts any evidence of low intelligence to the point where it would have an effect on the outcome of his trial or sentencing.
 "Dr. Fisher testified that the petitioner was dependent and easily led by outside influences because of his upbringing, and that he was unable to make independent decisions. The basis of this opinion was the testimony of family members. Dr. Fisher's opinion was that with extensive and consistent abuse and abandonment as a child, one is more likely than a child who has not been consistently abused and abandoned to develop major psychological problems. (Evidentiary Hearing R. 308). There is no doubt that petitioner lived with different relatives and that there was some physical abuse but the evidence of physical abuse is negligible. *Page 1194 
 "Petitioner's sister, Glen Jones, testified to abuse by their father. She testified that her father was rarely around but when he did come that he would make petitioner and Glen take off their clothes, would tie them to a door knob and beat them with a cord. She testified that the beatings with a cord were so severe that wire from the extension cord was embedded in their flesh. The Court concludes that this is an exaggeration and that had this abuse occurred there would be some obvious scarring from where such young children were beaten to the point where the insulation of an extension cord was torn off and wire was embedded in their skin. The other evidence of abuse is negligible.
 "The opinion of Dr. Fisher as to the effects upon petitioner of this `abusive childhood' is rebutted by other family members that testified, including Glen Jones. Their testimony suggests that, although petitioner had to live with relatives and was beaten by his father and had other problems with family members, he adjusted well. Petitioner made good grades in school and had no trouble with teachers. He was helpful to people and was polite and well behaved. He was able to maintain employment and although he had a few problems with attendance, was generally considered to be a good worker. Petitioner attended church and played in the school band. He was not a violent person growing up.
 "Mr. Wright, Jones's uncle, testified that petitioner was capable of making his own decisions but that he basically followed his friends. When asked if the problems that petitioner faced growing up in the neighborhood and the pressures from his friends who used drugs were not the normal pressures that anyone faced growing up where Jones did, Wright answered `Yes.' (Evidentiary Hearing R. 224). He followed his friends who were into drugs because they were his childhood friends and although some of them were not into drugs, some were. He followed the example of people who did not get into trouble but, `[i]t just happened that he was with the ones that had got into trouble.' (Evidentiary Hearing R. 245).
 "This Court agrees that the pressures that petitioner was under in his neighborhood and in his upbringing were pressures normally faced by individuals in his situation, and, therefore, do not exhibit any individual, unique tendency in the personality of petitioner to follow the wrong example.
 "All the testimony as to drug use reflects that the drug use was voluntary and there was no evidence of organic effects of his long-term drug use. Voluntary drug use has never excused or mitigated a crime of this nature in the State of Alabama nor does it in this case.
 "After considering the testimony of Dr. Fisher and examining the basis from which he formed his opinion, this Court is of the opinion that there is no credible evidence of significant mental health problems in petitioner."
(C.R. 1050-55.)
The record supports the trial court's findings. We agree with the trial court that the evidence presented by Jones in support of this claim, including the testimony of Dr. Fisher and the depositions and affidavit of other expert witnesses, was not adequate evidence of a mitigating circumstance and was refuted by other testimony and evidence admitted at the hearing and at trial. It is particularly significant that although Jones was provided with the opportunity and was even transported to a proper facility to be tested to determine an organic basis for the alleged mental health problems before his Rule 32 hearing, he admitted no test results but relied solely on opinion evidence to establish his alleged mental health problems. Additionally, we find significant the finding of the Lunacy Commission, which conducted an evaluation before Jones's trial that was relied upon heavily by his Rule *Page 1195 
32 witnesses, that Jones was not suffering from a mental illness at the time of the acts charged that would have prevented him from distinguishing right from wrong or that would have prevented him from adhering to what was right. In this situation, the trial court made certain credibility determinations which are within its discretion. Brownlee v. State, 666 So.2d 91
(Ala.Cr.App. 1995). We concur with the trial court's finding that Jones has failed to establish concrete evidence to support the suggestion that he was under extreme mental and emotional stress during the murders. See § 13A-5-51, Ala. Code 1975. Consequently, Jones has failed to meet his burden of proof to establish a claim of relief in this regard. See Rule 32.3, Ala.R.Crim.P.
2. Evidence that Jones did not kill the victims.
At the Rule 32 hearing, Jones presented testimony from Dr. Bryan Frist, a forensic pathologist, to support this claim. Dr. Frist testified that based on his review of the crime scene photographs, his examination of the victims' autopsy reports, and his review of the trial transcript, he believed that the victims died as a result of the actions of Jones's accomplice, which occurred prior to Jones's involvement in the incident. The state admitted into evidence the deposition of Dr. Joseph Embry, the certified forensic pathologist who conducted the autopsy on the victims, to refute this conclusion. We find that the trial court findings provide a thorough, accurate assessment of the testimony and evidence to be considered with regard to this claim:
 "As to Willene Nelson, there was testimony at trial from Charlie Nelson, one of the children, and also a surviving victim, that he heard his mother moaning before she was stabbed by Jones. Dr. Frist attempted to give an explanation for the moaning as simply fluids building up in the lungs and that said noises were not unusual. It is the Court's opinion that this is not a reasonable explanation for the moaning of the victim. The Court therefore finds that the evidence shows that Willene Nelson was indeed alive and moaning before she was stabbed by Aaron Jones. When asked the basis of his assumption that the first person that started stabbing Willene was the one who inflicted the fatal wounds, Dr. Frist stated that with all the defensive wounds and all the stab wounds on her, there would be a lot of blood around because she would have continued struggling until she died and that was not the case with the murder scene. When asked if she could have fainted or otherwise passed out before she received the fatal wound, Frist agreed, but stated that he would have to have an explanation of why Willene passed out. He stated there were no blows significant enough to cause her to pass out.
 "There is significant evidence that Willene Nelson was pistol-whipped before she was killed. Dr. Embry's autopsy report is specific and described numerous injuries to her head, and concluded that the instrument that made those injuries created patterns that matched the grip of a pistol. There was testimony from witnesses at trial that she was being beaten as well. Essentially, Dr. Frist's opinion is based upon his experience with facts of other cases and not with the medical evidence available [in this case]. Dr. Frist stated the following:
 "`I have done cases where we know the perpetrator goes into a residence. He does the murder or the act and then goes outside and tells his cohort "You have to do something," to tie him in and make him part of the crime. I believe that is what happened here. (Evidentiary Hearing R. 87-A).'
 "Therefore, his opinion goes outside his medical expertise and involves interpreting within a theory developed from the facts of other cases. *Page 1196 
 "Dr. Embry in his deposition on March 8, 1996, defended his opinions that he testified to in 1982 and the autopsies that he performed on Carl and Willene Nelson. Dr. Frist stated that death to Carl Nelson from the gunshot wound to his heart was instantaneous and that any further wounds would have been post-mortem. Dr. Embry stated simply that the amount of blood he found in the cranial cavity was such an amount to show that there was blood pressure after Carl Nelson was shot through the heart. The blood was the result of the knife wound that he had previously testified would have been fatal and was delivered before death. Dr. Embry stated that a wound to the heart with a low caliber handgun, either .22 or .32, would not necessarily cause instantaneous death and that the heart would continue to beat for several minutes. He testified that Carl Nelson's wound was such a wound and that the heart continued to beat and that such was evident by the hemorrhaging around the knife wound. As the caliber of the bullet increases, the damage to the heart is more severe and a large caliber bullet would cause, in most cases, instantaneous death. That was not the case in the death of Carl Nelson."
(C.R. 1056-57.)
We find no abuse of discretion in the trial court's finding that Dr. Embry's testimony was more credible than Dr. Frist's, and its subsequent finding that Dr. Frist's testimony would not have been considered mitigating by the jury or by the court. Brownlee, supra. Additionally, we concur with the trial court's observation that "this crime was so savage and brutal that participation in any way by the petitioner would have weighed conclusively against mitigating his involvement on the basis of who was the particular individual who delivered the fatal blows to the victims." (C.R. 1058.) Therefore, we find no error in the trial court's determination that no mitigating circumstance existed in this regard.
3. Evidence about Jones's background from family members andfriends.
At the Rule 32 hearing eight of Jones's family members testified that they were never contacted by Jones's trial counsel to testify about Jones's family background. Additionally, Jones presented expert testimony from Dan Turberville, an attorney who had tried at least 40 capital cases, that at a minimum trial counsel should have contacted and interviewed members of Jones's family and investigated Jones's background. The trial court provided the following assessment of this testimony:
 "The mitigating evidence presented by the petitioner shows no more than a child of a broken family that had positive and negative influences in his life but chose to follow the friends that he grew up with that were taking drugs. From the testimony of these witnesses it is apparent that petitioner had the ability to do well in school, had people in whom he could confide and by whom he could be advised, was involved in church activities such as choir and other extracurricular activities such as playing in the school band. The petitioner's temperament was peaceful and the only negative influence appears to be the influence of his friends who used drugs.
 "Aaron Jones had the abilities and the opportunities to make the choices that everyone has to make in life and made the incorrect choice. When Aaron Jones started using drugs his life changed. His mitigation is that the drugs made him commit the crime. Frequently this has been interposed as a defense and as mitigation but it has never been accepted as an excuse to mitigate this type of crime.
 "The testimony of these witnesses is unconvincing. Had it been presented to the jury it would not establish mitigation for the acts of the petitioner."
(C.R. 1062.)
We have reviewed the testimony of Jones's family members and friends; none *Page 1197 
of their testimony supported a finding of a mitigating circumstance recognized by § 13A-5-51, Ala. Code 1975, and would not have changed the balance of the mitigating and aggravating circumstances in Jones's case. Therefore, we find no error in the trial court's determination that the evidence would not have changed the outcome of Jones's trial.
Moreover, because we have determined that evidence of Jones's alleged mental illness, the forensic evidence, and the testimony of family and friends would not have established a mitigating circumstance, we cannot hold that Jones's trial counsel was ineffective for failing to present this evidence. We note that there is nothing in the record to suggest that Jones's trial counsel ignored matters that should reasonably have alerted them to Jones's mental health or to the value of contacting persons who might have information about Jones's background that might aid in his defense. See Cochran v. State, 548 So.2d 1062 (Ala.Cr.App.), cert. denied, 493 U.S. 900, 110 S.Ct. 259, 107 L.Ed.2d 208 (1989). Jones has not proven by a preponderance of the evidence that his attorneys were ineffective because they failed to investigate and present possible mitigating evidence. Fortenberry, 659 So.2d at 200. "In a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether `the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Stevens v.Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied,507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993), quoted in Daniels, 650 So.2d at 568. Jones has not established a reasonable probability that but for his counsel's failure to call these witnesses and present the alleged mitigating evidence during the sentencing phase of his trial that the outcome of the sentencing proceeding would have been different.
 "Further, we cannot say that the appellant suffered any prejudice based on counsel's performance because he failed to demonstrate any evidence of mitigation. Prejudice cannot merely be alleged; it must be affirmatively proved. Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990). Thus, the appellant has not shown that there is a reasonable probability that the outcome of this trial would have been different, but for trial counsel's performance. Baldwin, Thompson v. State, 581 So.2d 1216 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1030
(1992)."
Brooks v. State, 695 So.2d 176, 182 (Ala.Cr.App. 1996), aff'd,695 So.2d 184 (Ala. 1997), cert. denied, 522 U.S. 893, 118 S.Ct. 233,139 L.Ed.2d 164 (1997). See also Waters v. Thomas, 46 F.3d 1506,1511 (11th Cir.), cert. denied, 516 U.S. 856, 116 S.Ct. 160,133 L.Ed.2d 103 (1995) ("our decisions teach that whether counsel's performance is constitutionally deficient depends upon the totality of the circumstances viewed through a lens shaped by the rules and presumptions set down in Strickland v. Washington, and its progeny"); and Singleton, supra (petitioner made no showing of prejudice resulting from alleged inadequate investigation by trial counsel where petitioner failed to proffer the type of mitigating evidence that would have changed outcome of trial had trial counsel conducted further investigation). Because Jones has not shown that any additional evidence would have changed the trial court's decision regarding sentencing, we agree with the trial court's ruling that trial counsel did not render ineffective assistance with regard to the investigation and presentation of mitigating evidence during the sentencing phase of Jones's trial.Davis v. State, 720 So.2d 1006 (Ala.Cr.App. 1998), cert. denied,525 U.S. 1149, 119 S.Ct. 1049, 143 L.Ed.2d 55 (1999).
Jones claims that his trial counsel provided ineffective assistance of counsel during the guilt phase and the sentencing phase of his trial. He alleges the following *Page 1198 
as instances of ineffective assistance of counsel:
 1. His attorneys failed to adequately seek and present evidence in support of a change of venue.
 2. His attorneys failed to adequately investigate and research the racial composition of Blount County and the representation by race and other cognizable groups on the grand jury, the jury pool, the jury venire, and the trial and sentencing jury panel.
 3. His attorneys failed to conduct an adequate voir dire examination of potential jury members so as to identify those jurors who would, based on a conviction, automatically sentence Jones to death in violation of his constitutionally protected rights.
 4. His attorneys failed to adequately investigate and attack the violations of his Fifth and Sixth Amendment rights in connection with the State's obtaining and using at trial an allegedly unconstitutionally obtained statement by Jones.
 5. His attorneys failed to adequately preserve the record by failing to have several bench conferences transcribed.
 6. His attorneys failed to investigate and to adequately cross-examine state witnesses whose testimony had to be challenged to protect his rights.
 7. His attorneys failed to object to the prosecutor's arguments at both the guilt and sentencing stages.
 8. His attorneys failed to prepare for or to defend against any of the aggravating circumstances offered and relied upon by the State in the sentencing phase of his trial.
 9. His attorneys failed to object to the prosecutor's comments on victim and family member impact.
 10. His attorneys failed to adequately challenge the systematic underrepresentation of blacks, women, and other cognizable groups in the jury pool from which Jones's grand and petit jury were selected.
 11. His attorneys failed to investigate the crime scene in order to determine if there was any exculpatory evidence.
 12. His attorneys failed to "seek appropriate expert assistance for the pretrial, trial, and sentencing proceedings."
 13. His attorneys failed to seek funds to retain a private investigator who could have supplied information on Arthur Lee Giles.
 14. His attorneys were ineffective in that they requested defense funds for experts in the presence of the prosecution, thereby improperly revealing defense strategy.
 15. His attorneys were ineffective because they failed to seek to voir dire the veniremembers individually, rather than in panels of 10.
 16. His attorneys failed to note for the record the race of the veniremembers struck from Jones's jury.
 17. His attorneys improperly waived Jones's right to a sequestered jury by withdrawing their motion for a sequestered jury.
 18. His attorneys failed to object to what Jones says were improper and prejudicial jury verdict forms.
 19. His attorneys failed to make a number of critical pretrial motions and trial motions.
 20. His attorneys failed to request that the members of the jury be polled after the jury rendered its verdict.
 21. His attorneys failed to present effective arguments before the sentencing court on why Jones's life should be spared.
 22. His attorneys failed to object to the admission of an allegedly prejudicial presentence report that included inadmissible hearsay.
 23. His attorneys failed to object to electrocution as cruel and unusual punishment. *Page 1199 
 24. His attorneys failed to make use of any jury questionnaires.
 25. His attorneys "prejudiced [Jones] by informing the Court that the state had offered [Jones] a plea bargain."
Although the burden of pleading and proof as to these arguments was on Jones, see Rule 32.3, Ala.R.Crim.P., he presented no evidence at the hearing to support his argument that his counsel's performance with regard to these claims fell "outside the wide range of professionally competent assistance."Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. He failed to satisfy the burden-of-proof requirements of Rule 32.3. Furthermore, Jones presented no evidence to show how he was prejudiced by these alleged instances of ineffective assistance.McNair v. State, 706 So.2d 828 (Ala.Cr.App. 1997), cert. denied,523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998). As this court observed in Stringfellow v. State, 485 So.2d 1238, 1243
(Ala.Cr.App. 1986), "`[e]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made.'"
Finally, we note that in his petition Jones claims that his counsel was ineffective for "failing to include in a motion for a new trial each and every constitutional violation enumerated" in his petition. Jones, however, abandons this claim on appeal. "`"[A]llegations . . . not expressly argued on . . . appeal . . . are deemed by us to be abandoned." United States v. Burroughs,650 F.2d 595, 598 (5th Cir.), cert. denied, 454 U.S. 1037,102 S.Ct. 580, 70 L.Ed.2d 483 (1981).'" Brownlee v. State, 666 So.2d at 93, quoting Burks v. State, 600 So.2d 374, 380 (Ala.Cr.App. 1991). In an exercise of diligence, however, we have reviewed each and every allegation of ineffective assistance of counsel and have found either that the allegation is without merit or that Jones failed to prove it. We have also considered the collective effect of all of the alleged errors and still find no error or violation of Jones's rights.
After reviewing the overwhelming evidence against Jones, including his confession, we believe that while his trial counsel may have made certain strategic choices that Jones now challenges, counsel did not render ineffective assistance. An accused is entitled "`not [to] errorless counsel, and not [to] counsel judged ineffective by hindsight, but [to] counsel reasonably likely to render and rendering reasonably effective assistance.'" Thompsonv. State, 615 So.2d 129, 134 (Ala.Cr.App. 1992), cert. denied,510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 418 (1993), quoting Haggardv. Alabama, 550 F.2d 1019, 1022 (5th Cir. 1977). We find no merit to any of Jones's allegations of ineffective assistance of counsel. Jones has not shown "by a preponderance of the evidence the facts necessary to entitle [him] to relief" on any issue concerning the ineffectiveness of his trial counsel. Rule 32.3, Ala.R.Crim.P.
 IV.
Jones contends that his appellate counsel, who was the same counsel who represented him at trial, rendered ineffective assistance. Jones claims that his appellate counsel failed to "recognize at least some of the real grounds for an effective appeal." (Appellant's brief at p. 43.) Specifically, he argues that his appellate counsel should have raised the following issues:
 1. The failure to give a jury charge on intoxication and on the lesser included offense of manslaughter;
 2. The trial court's omission of the required particularized intent instruction; and
3. The trial court's erroneous burden-shifting instruction.
However, because we have addressed these issues in light of Jones's claim of ineffective assistance of trial counsel and found that they did not constitute reversible error, Jones's appellate counsel cannot be held to be ineffective for failing to argue these issues on appeal. Moreover, at the conclusion of our affirmance of *Page 1200 
Jones's direct appeal, we stated: "In accordance with Rule 45A, Ala.R.App.P., we have carefully reviewed the record for any errors which would have adversely affected the rights of the appellant and found none." Jones v. State, 520 So.2d at 549. While we acknowledge that Jones's appellate counsel may have made decisions that Jones now questions, we do not find that Jones's appellate counsel was ineffective.
 V.
Jones contends that his rights to a fair trial by an impartial jury, to the free exercise of peremptory challenges, and to due process were violated by the alleged misconduct of juror J.M. Specifically, Jones argues when the jurors were asked whether they knew any of the witnesses or if they knew anything about the facts of this case, J.M. failed to disclose that he knew Sheriff J.C. Carr and the various deputies who testified at trial, that he had worked for the victims, and that he had been inside the victims' residence.
At the outset, we note that Jones has satisfied his burden of proving that the alleged improper conduct by J.M. constitutes newly discovered evidence; the alleged misconduct was not known at the time of trial or at the time of direct appeal. State v.Freeman, 605 So.2d 1258 (Ala.Cr.App. 1992) (holding that the jury foreman's failure to answer truthfully was newly discovered evidence in a capital murder case and the defendant's claim that her right to a fair trial was violated was not procedurally barred for defendant's failure to raise issue on direct appeal where information was not known at time of trial or at time of direct appeal).
To determine whether a defendant was prejudiced by a juror's failure to respond truthfully to a question during voir dire examination, the test is whether the defendant actually was prejudiced. Knight v. State, 710 So.2d 511 (Ala.Cr.App. 1997). See Dawson v. State, 710 So.2d 472 (Ala. 1997). To assist in the determination of prejudice, the following factors have been considered pertinent:
 "[the] temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about."
Tomlin, 695 So.2d at 170, quoting Johnson v. State, 536 So.2d 957,958 (Ala.Cr.App. 1987), cert. denied, 490 U.S. 1046,109 S.Ct. 1955, 104 L.Ed.2d 424 (1989). "`Thus, the facts in each case must be considered individually and much will remain in the discretion of the trial judge.'" Tomlin, 695 So.2d at 170, quoting Parish v.State, 480 So.2d 29, 30 (Ala.Cr.App. 1985).
In light of the foregoing caselaw, we will now address Jones's allegations of juror misconduct separately.
1. Juror J.M.'s association with various witnesses.
Jones's counsel asked the following question during voir dire examination of the jury venire:
 "Do any of you know J.C. Carr? Everyone in the county knows J.C. Carr — 72% of you voted for him and kept him in office for six terms. My question would be with respect if you know him on a personal basis — member of the same church, or social organizations that you felt it would affect the way you receive the testimony from J.C. or some of his deputies? Mr. Tom Ed Dick[ey], do any of you know him? Mr. Billy [Erbin]? Mr. Fred [Alcorn]? Do any of you know J.C. on a personal basis.?"
(C.R. 340.) J.M. did not respond to this question and was selected as a member of the jury. Just prior to his Rule 32 hearing, Jones learned that J.M. knew the sheriff and several of his deputies.
During the hearing, J.M. testified as follows concerning any effect his acquaintanceship *Page 1201 
with the sheriff and his deputies had upon his role as a juror:
 "[Jones's counsel]: In fact, you knew just about everybody around, didn't you?
"[Juror J.M.]: Well, yeah.
 "[Jones's counsel]: You knew Judge NeSmith who was the judge at the time of the trial"
"[Juror J.M.]: Yeah, uh-huh.
". . . .
"[Jones's counsel]: And you knew officer Tom Ed Dickey?
"[Juror J.M.]: Yes.
"[Jones's counsel]: And you knew officer Fred Alcorn?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And you knew officer Billy Erbin?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And you knew the sheriff, J.C. Carr?
"[Juror J.M.]: Yeah, right.
 "[Jones's counsel]: Do you recall whether you informed the court whether you knew these people?
"[Juror J.M.]: I don't recall. I don't believe I was asked.
 "[Jones's counsel]: Were you questioned by any of the attorneys for the defendant as to whether or not you knew any of those people?
 "[Juror J.M.]: Yeah, I think so. I don't — you know, that has been a long time ago.
 "[Jones's counsel]: Sure, I understand. But do you recall whether in court in front of the Judge —
"[Juror J.M.]: I believe Judge NeSmith, yeah.
 "[Jones's counsel]: Okay. Did you know Officer Tom Ed Dickey well enough to form an opinion as to whether or not you found him to be an honest and truthful person?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And was the same true of Fred Alcorn?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And Billy Erbin?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And Sheriff Carr?
"[Juror J.M.]: Yeah.
". . . .
 "[Prosecutor]: [J.M.], the fact that you knew Judge NeSmith, Mr. Dickey, Mr. Alcorn, Mr. Erbin . . ., did that effect your verdict?
"[Juror J.M.]: No, un-un.
 "[Prosecutor]: Do you recall being asked that in court by a lawyer?
 "[Juror J.M.]: I don't recall it, no. It could have happened but I don't recall it being asked.
 "[Prosecutor]: So, do you recall the instructions of the court that you were supposed to make your decision on the verdict and on the sentence based upon what came from that bench right there and instructions from the Judge?
"[Juror J.M.]: Right, uh-huh.
 "[Prosecutor]: And even though you knew these people and you testified that they were truthful people, were you able to put that out of your mind to come to a deliberations?
"[Juror J.M.]: Render a verdict, yeah.
 "[Prosecutor]: Did you in fact render your decision based upon only what came from the witness stand?
"[Juror J.M.]: What we heard, yeah.
"[Prosecutor]: And the instructions from the Judge?
"[Juror J.M.]: Yeah."
(R. 262-66, 273-74.)
We are unwilling to say that J.M. failed to respond truthfully to the question posed by Jones's counsel during voir dire examination. It is significant that Juror J.M. actively engaged in voir dire and when asked admitted that he knew the victims. As asked, the question left room for subjective interpretations by the veniremembers. Therefore, we do not find that *Page 1202 
Juror J.M.'s failure to respond to this question constitutes juror misconduct.
Moreover, Juror J.M. testified at the Rule 32 hearing that even though he knew these witnesses and perhaps had formed an opinion that they were truthful, he based his verdict on the testimony presented and on the trial court's instructions. Because no evidence was presented that Juror J.M.'s acquaintanceship with the sheriff and his deputies actually prejudiced Jones, we find no basis for reversal on this claim. See Limbaugh v. State, 581 So.2d 5, 8-9 (Ala.Cr.App. 1991) (a juror's failure to disclose that her daughter had died as the result of an unsolved car bombing did not create reversible error where the question calling for the information was ambiguous and she testified that the circumstances surrounding her daughter's death had no effect whatsoever upon her ability to reach a fair and true verdict). Cf. Davis v. State, 51 Ala. App. 200, 283 So.2d 650
(1973) (where the precise question was whether the veniremember or the veniremember's spouse had been in law enforcement, the juror had no duty to disclose the fact that his father had been a circuit solicitor).2. Juror J.M.'s association with the victims and hisknowledge of the "layout" of the victims' house.
The trial court asked the following question during voir dire examination of the jury venire:
 "Do any of you ladies and gentlemen of this jury venire know anything about the facts of this case which would influence your verdict one way or the other?"
(R. 8.) Although J.M. admitted that he knew the victims, he did not reveal that he had frequented the victims' house. Just before his Rule 32 hearing, Jones learned that J.M. had made service calls to the victims's house.
During the hearing, Juror J.M. testified as follows concerning his acquaintanceship with the victims and his knowledge of the layout of their house:
 "[Jones's counsel]: Prior to the beginning of the trial in 1982 did you know Carl Willie Nelson?
"[Juror J.M.]: Yeah.
"[Jones's counsel]: And did you know him quite well?
"[Juror J.M.]: Yeah, I had done work for them.
 "[Jones's counsel]: You did work at their house on more than one occasion?
"[Juror J.M.]: Yeah, uh-huh.
 "[Jones's counsel]: And of course during that work you became quite familiar with the interior of that house; is that correct?
"[Juror J.M.]: Yeah, some parts of it.
"[Jones's counsel]: Which parts?
 "[Juror J.M.]: The kitchen, back porch, well pump, washing machine.
 "[Jones's counsel]: And you knew the layout of the house, how the rooms were arranged, that sort of thing?
"[Juror J.M.]: Just the back porch and kitchen.
 "[Jones's counsel]: At the time of the trial did you consider the Nelsons to be clients or customers of yours?
 "[Juror J.M.]: Well at the time I knew them I was working with a local gas company down here doing their service work.
 "[Jones's counsel]: How many times prior to your service on the jury had you been in the Nelson home?
"[Juror J.M.]: Oh, two or three times.
 "[Jones's counsel]: And you understood that that was the same location that the events in question in the trial occurred?
"[Juror J.M.]: Yeah. Yeah.
 "[Jones's counsel]: Now, when you were following the evidence and the testimony of the trial, you had a picture in you head of that scene, that house where the events occurred; is that right?
"[Juror J.M.]: Well I knew where the location was. *Page 1203 
 "[Jones's counsel]: And you were familiar with the house, you could recall what it looked like?
"[Juror J.M.]: Just the kitchen and the back porch."
(R. 266-68.)
We are unwilling to say that J.M. responded untruthfully to the question posed by the trial court during voir dire examination and that his failure to respond constituted juror misconduct. The question, "Do any know anything about the facts of this case which would influence your verdict one way or the other?" left room for subjective interpretations. From the testimony presented at the Rule 32 hearing, Juror J.M. had limited knowledge of the victims' house. We do not find the fact that Juror J.M. had made two or three service calls and knew the kitchen and back porch of the victims' house, in light of the fact that the murders occurred in another location in the house, to constitute "facts of this case." Moreover, Jones had been informed that J.M. knew the victims and counsel could have explored during voir dire examination the basis of that knowledge. Finally, Jones has failed to establish that J.M.'s failure to indicated that he had frequented the victims' house on two or three occasions before the murders prejudiced him. Therefore, we find no basis for a finding that J.M.'s actions were prejudicial. See also Brownlee v. State,545 So.2d 151 (Ala.Cr.App. 1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 527
(1989) (the mere fact that a juror is personally acquainted with the victim does not automatically disqualify him from sitting on the criminal jury).
Finally, we find nothing to indicate that Jones's trial counsel would have struck J.M. had he known the information J.M. revealed at the evidentiary hearing. Consequently, Jones has not satisfied his burden of pleading and proving this claim. See Rule 32.3 and 32.6(b), Ala.R.Crim.P.
Additionally, we reject Jones's claim that his "death sentence was the result of coercive influences brought into the jury deliberations which were outside the scope of the evidence and judicial control." (Appellant's brief at p. 97.) Specifically, he argues that a juror's statement that "if we give him life that maybe in a few years that he would be up for parole" improperly persuaded others to sentence him to death. (R. 275-76.)
Testimony at the Rule 32 hearing indicated that before reaching its 12-0 advisory verdict recommending a sentence of death, the jury voted several times. Several ballots resulted in a 10-2 determination to recommend death. One of the two individuals who initially voted against death testified that she changed her vote in favor of death after J.M. made the statement regarding parole.
"A juror cannot impeach his verdict by later explaining why or how the juror arrived at his or her decision." Adair v. State,641 So.2d 309, 313 (Ala.Cr.App. 1993).
Moreover, Rule 606(b), Ala.R.Evid., provides, in pertinent part:
 "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify in impeachment of the verdict or indictment as to any matter or statement occurring during the course of the jury's deliberations or the effect of anything upon that or any other juror's mind or emotions as influencing the juror as to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be *Page 1204 
precluded from testifying be received for these purposes."[2]
We find no merit to Jones's claim because it was based on prohibited testimony. A consideration of the claim would destroy the integrity of the jury system, encourage the introduction of unduly influenced juror testimony after trial, and discourage jurors from freely deliberating, and inhibit their reaching a verdict without fear of post-trial harassment, publicity, or scrutiny. See Ex parte Neal, [Ms. 1971139, January 8, 1999]731 So.2d 621 (Ala. 1999); and Barbour v. State, 673 So.2d 461,469-470 (Ala.Cr.App. 1994), aff'd, 673 So.2d 473 (Ala. 1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074
(1996).
Furthermore, Jones has failed to show that he suffered any prejudice in this regard. "[T]he judge, and not the jury, is the final sentencing authority in criminal proceedings.' Ex parteHays, 518 So.2d 768, 774 (Ala. 1986)." Ex parte Giles, 632 So.2d 577,583 (Ala. 1993), cert. denied, 513 U.S. 1199, 115 S.Ct. 1271,131 L.Ed.2d 149 (1995). Here, the challenged verdict is advisory. A jury during the sentencing phase only needs 10 votes to render an advisory verdict of death. Before J.M.'s alleged coercive statement the vote was 10-2 for a recommendation of death; therefore, we find J.M.'s alleged improper influence to be at most harmless error. Rule 45, Ala.R.App.P.
 VI.
In his petition Jones claims that "[s]ince the time of trial, newly discovered evidence critical to the issues of conviction and sentencing has arose." (C.R. 209.) Specifically, Jones argues that there is a discrepancy between the testimony of Brenda Nelson at Jones's trial and her testimony at the sentencing hearing of Jones's accomplice. However, Jones abandoned this claim on appeal. Brownlee v. State, supra.
Moreover, the trial court, after determining that Jones had failed to meet his burden of proof pursuant to Rule 32.1(e), Ala.R.Crim.P., addressed this claim on its merits. The trial court stated in its order:
 "The allegedly `newly discovered evidence' consists of the testimony of Brenda Nelson, the state's primary eyewitness in the trial of Mr. Jones, at the 1991 sentencing hearing of Arthur Lee Giles, the co-defendant of petitioner. In the sentence proceedings she testified that she had seen Arthur Lee Giles `killing' her mother with a knife.
 "During his cross-examination of Brenda Nelson, trial counsel for petitioner impeached her by bringing to her attention the statements that she had made under oath at prior proceedings in this case. The prior testimony was the same as that now alleged as newly discovered, namely that she had seen Arthur Lee Giles, not the petitioner, attacking her mother with a knife. Trial counsel successfully entered into the record portions of the preliminary hearing and of the petitioner's first trial in 1979, and successfully prevented the prosecution from entering the entire document. Brenda Nelson's inconsistent statement is not newly discovered but was known by petitioner's counsel at time of trial and utilized by them to impeach the primary witness that the state produced. Nelson's re-statement at Giles's 1991 hearing is identical to previous inconsistent statements and is cumulative to the facts known at the time of trial. Rule 32.1(e)(2) and Rule 32.1(e)(3)."
(C.R. 1068.)
We agree with the trial court's finding that Brenda Nelson's inconsistent statements do not constitute newly discovered evidence. Rule 32.1, Ala.R.Crim.P. *Page 1205 
 VII.
Additionally, we note that numerous claims in Jones's petition, which he abandoned at the evidentiary hearing and on appeal, were precluded by the procedural bars of Rule 32.2(a). This court has recognized that "[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed." State v. Tarver, 629 So.2d at 19. See Horsley v. State, 675 So.2d 908 (Ala.Cr.App. 1996);Grayson v. State, 675 So.2d 516 (Ala.Cr.App. 1995), cert. denied,519 U.S. 934, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996); Brownlee, supra; Cade v. State, supra.
We find that the following claims in Jones's petition are procedurally barred under Rules 32.2(a)(2) and (4), Ala.R.Crim.P., because they were raised and addressed at trial and on direct appeal:
 1. Jones's claim that his right to a fair trial by an impartial jury was violated by the trial court's failure to grant a change of venue. Jones v. State, 520 So.2d at 546-48.
 2. Jones's claim that the trial court's and appellate court's failure to consider mitigating evidence that was clear from the record violated Alabama law and his rights under the Eighth and Fourteenth Amendments to the United States Constitution. Jones v. State, 520 So.2d at 555.
We find that the following claims in Jones's petition are procedurally barred under Rules 32.2(a)(3) and (5), Ala.R.Crim.P., because they could have been raised at trial and on direct appeal, but were not:
 1. Jones's claim that he was deprived of a fair trial by the systematic underrepresentation of blacks and other cognizable groups in the grand jury.
 2. Jones's claim that he was deprived of a fair trial by the systematic underrepresentation of blacks and other cognizable groups in the trial jury.
 3. Jones's claim that he was deprived of a fair trial by the prosecutor's use of peremptory challenges in a racially discriminatory manner.
 4. Jones's claim that the trial court's instruction on capital murder and the lesser included offenses of murder in the first degree and murder in the second degree were inadequate and violated his right to due process and to a fair trial.
 5. Jones's claim that he was denied a fair trial by the prosecutor's improper closing argument during both the guilt stage and the penalty stage, including references to the worth of the victims and the victims' family and his racist, inflammatory, and prejudicial characterization of Jones.
 6. Jones's claim that Alabama's death penalty is arbitrarily and discriminatorily applied in violation of the Eighth and Fourteenth Amendments.
 7. Jones's claim that the failure to transcribe fully all trial court proceedings and to preserve and secure all physical evidence and trial exhibits deprived him of a full appeal and a statutorily mandated review of his capital conviction and his sentence of death.
 8. Jones's claim that his right to stand trial was violated because the trial court failed to hold a pretrial hearing concerning his competency to stand trial.
 9. Jones's claim that the state's introduction at trial of allegedly highly inflammatory and prejudicial photographs of the victims violated his rights.
 10. Jones's claim that prosecutorial misconduct deprived him of rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the State Constitution of Alabama.
 11. Jones's claim that he was convicted of capital murder and sentenced to death, despite a lack of evidence that he had the intent to kill.
 12. Jones's claim that the Alabama death penalty statute violates the Sixth, Eighth, and Fourteenth Amendments and the Alabama Constitution by failing to provide meaningful comparative review for those defendants under a sentence of death. *Page 1206 
 13. Jones's claim that electrocution as a means of punishment violates the Eighth Amendment's prohibition against cruel and unusual punishment.
 14. Jones's claim that the trial court's instruction on intent and malice shifted the burden of proof and violated his rights to a fair trial and due process.
 15. Jones's claim that he was denied a fair trial by the prosecutor's allegedly improper closing argument during both the guilt stage and the penalty stage of his trial.
We find that the following claims in Jones's petition are procedurally barred under Rules 32.2(a)(2) and (5), Ala.R.Crim.P., because they were raised and addressed at trial and could have been raised and addressed on direct appeal, but was not:
 1. Jones's claim that he was deprived of due process, equal protection, and a fair trial and sentencing determination because the trial court refused to provide funds for expert assistance.
 2. Jones's claim that the admission of his inculpatory statement violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.
As previously stated, this court on direct appeal searched the entire transcript for error, pursuant to Rule 45A, Ala.R.App.P. If this court had found anything that would merit reversal, even if it had not been raised on appeal, we would have reversed the judgment and remanded this case for a new trial. Based on our review of the evidence presented at the evidentiary hearing on Jones's Rule 32 petition, we conclude that the trial court properly denied Jones's petition.
AFFIRMED.
Long, P.J., and McMillan, Cobb, and Baschab, JJ., concur.
[1] Degrees of murder were eliminated when the current Death Penalty Statute was enacted, effective July 1, 1981. That statute applied only to conduct occurring after July 1, 1981. The murders Jones was charged with occurred in 1978.
[2] Although the Alabama Rules of Evidence became effective January 1, 1996, Rule 606(b) "leaves unchanged Alabama's historic `anti-impeachment' rule." Advisory Committee's Notes, Rule 606.