[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 20, 2006
THOMAS K. KAHN
CLERK

No. 04-11911

———————

D. C. Docket No. 00-03608-CV-J-S

AARON LEE JONES,

Petitioner-Appellant,

versus

DONAL CAMPBELL, Commissioner,
Alabama Department of Corrections,

Respondent-Appellee.

———————

Appeal from the United States District Court
for the Northern District of Alabama

———————

(January 20, 2006)

Before ANDERSON, BIRCH and DUBINA, Circuit Judges.

DUBINA, Circuit Judge:

An Alabama jury found petitioner Aaron Lee Jones ("Jones") guilty of capital murder and recommended that he be sentenced to death. After exhausting his state court remedies, Jones filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254. The district court denied Jones's habeas petition, but granted a certificate of appealability ("COA") on several claims of ineffective assistance of counsel. After a thorough review of the record, and having the benefit of oral argument and the parties' briefs, we affirm the district court's judgment denying Jones habeas relief.

## I. BACKGROUND

A. *Facts*

The facts are recited verbatim from the opinion of the Alabama Court of Criminal Appeals on direct appeal from Jones's conviction and sentence.

> Tony Nelson testified that on the morning of November 10, 1978, he was sleeping with his ten-year-old brother, Charlie, in one of the bedrooms of his parents' home in the Rosa community in rural Blount County, Alabama. His thirteen-year-old sister, Brenda, was sleeping with their parents, Willene and Carl Nelson, in another bedroom. Tony's grandmother was sleeping by herself in a third bedroom of the home.
>
> At 3:27 a.m. Tony was awakened by a disturbance inside the home. When the light in his bedroom was turned on, he saw Arthur Lee Giles, a former employee of his father, standing in the doorway of

2

Tony's bedroom. Tony's father appeared and asked Giles to leave. Tony got out of bed and followed Giles to make sure Giles left as directed. As Tony stepped out the back door of the home Giles shouted "here," and shot him twice, once in the neck and once in the chest. Giles, then, re-entered the Nelsons' home. Tony made an effort to go and get a gun, but was unable to do so due to his injuries. Instead, he crawled to, and hid under, his father's truck. Shortly, thereafter, he heard Giles and another man exit his parents' home. He saw the men only from the waist down. He heard one of them say that they needed to find Tony and that the other man should "get the money." After they left, Tony went back inside. In his parents' bedroom he found his mother, his father, his sister, and his brother. All four had been severely wounded and there was blood all over them. Charlie and Brenda responded when Tony asked if anyone was still alive. His parents were dead. Tony rushed Brenda and Charlie to the hospital where all three, including Tony, were treated for their wounds.

Charlie Nelson testified that he saw Giles when his father, Carl Nelson, asked Giles to leave the home. He saw Tony leave and heard two gunshots. Giles, then, reappeared and shot Charlie's grandmother, who was standing in the doorway to Charlie's bedroom. Giles proceeded to Charlie's parents' bedroom from where Charlie heard more gunshots. Charlie ran to his parents' bedroom, where he saw Giles and another man, whom he positively identified at trial as the appellant. He realized that his mother, his father and his sister had all been shot. He jumped on top of his sister to protect her from further harm. As he lay there, he saw the appellant stab his mother and father with a knife. His mother and father were both moaning as the appellant repeatedly stabbed them. The appellant turned and stabbed Charlie's sister Brenda, who had already been shot above one eye. Charlie was hit in the head several times, after which the appellant stabbed him twice in the back.

On cross-examination Charlie admitted that during appellant's first trial Charlie had stated that Giles and the appellant appeared to be

3

drunk. He also stated that Giles "ordered the appellant around" and directed the appellant to stab his victims.

Brenda Nelson confirmed those parts of Tony's and Charlie's testimony as to things she had witnessed. She identified the appellant at trial as the man she saw repeatedly stabbing her mother. She stated that Giles was the one that shot her, Brenda, in the head.

Dr. Joseph Embry of the Alabama Department of Forensic Science testified that Willene Nelson died from multiple stab wounds that damaged her heart, lungs, and kidneys. Her body received 29 knife wounds (17 stab wounds and 12 slash wounds), numerous lacerations and abrasions about the head from a blunt instrument, and one gunshot wound to the left shoulder. Dr. Embry testified that Carl Nelson died from a combination of gunshot wounds and stab wounds. He was shot once through the heart and once in the left arm. He was stabbed, approximately, eight times, including a stab wound in the neck which severed his spinal cord. He also received numerous blunt instrument abrasions about the head. Dr. Embry testified that Carl Nelson was alive when he was stabbed in the neck.

Billy Irvin, an investigator with the Blount County Sheriff's Department, testified that he interviewed the appellant at 8:15 a.m. on November 11, 1978. During this interrogation the appellant confessed to his participation in the events at the Nelsons' home the previous night. Appellant's confession was tape recorded and transcribed. The appellant reviewed the transcript of his confession and signed it, voluntarily. After the trial court conducted a hearing and determined that appellant's confession was, indeed, voluntary, Irvin was permitted to read it to the jury.

In appellant's statement, he admitted participating in the activities that resulted in the deaths of Willene and Carl Nelson. According to the appellant, although they never found any money, he and Giles went to the Nelsons' home to rob Carl Nelson. Giles had told the appellant that Carl Nelson had not sufficiently paid Giles for work Giles had done for Nelson in the past. Giles and the appellant had

4

been drinking rum and beer prior to their trip to the Nelson's home. They were both armed with .32 caliber pistols, but appellant's pistol would not fire at the Nelsons' home because he lost the firing pin. The appellant's statement confirmed the gruesome details of the attack on the Nelson family. He stated that by the time he entered the back bedroom, Giles had already shot and stabbed "everyone." In his own words the appellant stated:

> "I goes off in the other room where he [Giles] at . . . shot and stabbed them all there, you know, the kids and . . . he looks at me and tells me, you know, that I had to do something and I told him that I didn't have a knife so he gave me one and I cut the mother and another man and cut the boy and that's all I did."

The appellant further stated that he used a butcher knife that Giles had, apparently, obtained from inside the Nelsons' home. He also said that the "little girl" at one point begged him not to do it, and that the "woman" moved right before he stabbed her. The appellant explained that when he stabbed the "woman" he "really was just so gone, I just closed my eyes" and stabbed wildly.

Although his confession was admitted into evidence, the appellant did not testify in his own behalf at trial, except during the suppression hearing on the issue of the voluntariness of his confession. In defense, he presented excerpts of the transcribed testimony, from his first trial, of several state's witnesses for impeachment purposes. He also presented his alleged accomplice, Arthur Lee Giles, who invoked his Fifth Amendment rights, and refused to testify. Appellant's theory in defense was that his participation in the double murder fell short of capital murder because Giles did all the actual killing and he, the appellant, only did what Giles instructed him to do.

The jury found the appellant "guilty as charged in the indictment" and the trial court, in accordance with the jury's recommendation, sentenced the appellant to death by electrocution.

*Jones v. State*, 520 So. 2d 543, 545-46 (App. Crim. App. 1984).

B. *Procedural History*

In 1979, an Alabama jury found Jones guilty of murder made capital because two or more human beings were intentionally killed by one or a series of acts. *See* Ala. Code § 13-11-2(a)(10) (1979) (repealed in 1981). The jury recommended a death sentence, and the judge agreed with the jury's recommendation. The Alabama Court of Criminal Appeals reversed the trial court's judgment and ordered a new trial pursuant to *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382 (1980), and *Ritter v. State*, 403 So. 2d 154 (Ala. 1981). *See Jones v. State*, 403 So. 2d 1 (Ala. Crim. App. 1981).

Following a retrial in 1982, a jury again found Jones guilty of capital murder and recommended that he be sentenced to death. The trial court followed the jury's recommendation and sentenced Jones to death. On appeal, the Alabama Court of Criminal Appeals remanded Jones's case for the trial court to clarify its sentencing order regarding the mitigating and aggravating circumstances. Following this limited remand, the Alabama Court of Criminal Appeals affirmed Jones's conviction and death sentence. *See Jones v. State*, 520 So. 2d 543 (Ala. Crim. App. 1984). The Alabama Supreme Court affirmed, *see Ex parte Jones*, 520 So. 2d 553 (Ala. 1988), and the United States Supreme Court denied *certiorari* review. *See Jones v. Alabama*, 488 U.S. 871, 109 S. Ct. 182 (1988).

In March 1990, Jones filed a petition for post-conviction relief pursuant to Rule 32, Ala. R. Crim. P., challenging his 1982 conviction and sentence. In May 1994, Jones filed an amended Rule 32 petition, reiterating numerous claims of ineffective assistance of counsel alleged in his original Rule 32 petition, and raising numerous other claims for relief. In November 1995, the trial court conducted an evidentiary hearing on Jones's allegations of ineffective assistance of counsel. In March 1996, Jones submitted several documents to support the allegations in his Rule 32 motion; namely, affidavits or depositions from Dr. B. E. Blankenship, Dr. Richard Cooksey, and Dr. James C. Thompson, who testified regarding Jones's mental health and childhood. In June 1996, the trial court entered an order denying Jones post-conviction relief.

In January 1997, Jones petitioned the trial court to supplement the record on appeal with an affidavit of Dr. Dave Davis, and the deposition of Dr. Scott Joseph. Jones stated that he filed courtesy copies of these two documents with the trial court in March 1996, but these documents were not part of the clerk's record. Dr. Davis, a psychiatrist, diagnosed Jones as suffering from paranoid schizophrenia. He also opined that Jones was in a state of toxic psychosis on the night of the murders, and due to this, Jones would have been unable to form the necessary intent to commit the crimes. R. Supp. Vol. 3, p. 616-18. Dr. Joseph, a psychiatrist, stated in his deposition that Jones had a history of psychosis and was taking Haldol to control his psychotic

symptoms. R. Supp. Vol. 2, p. 384. However, Dr. Joseph admitted that at the time he evaluated Jones, Jones had no active psychotic features. *Id.* at 390. Dr. Joseph also acknowledged that he relied on Jones's prison medical charts to form his opinion. *Id.*

The Alabama Court of Criminal Appeals affirmed the trial court's order denying Jones post-conviction relief, *see Jones v. State*, 753 So. 2d 1174 (Ala. Crim. App. 1999), and the Alabama Supreme Court denied Jones's petition for writ of *certiorari.*

On December 15, 2000, Jones filed the present federal habeas petition. In his § 2254 petition, Jones alleged numerous claims of ineffective assistance of trial and appellate counsel. In addition, Jones asserted that (1) the state trial and appellate courts failed to consider adequately both statutory and non-statutory mitigating circumstances; (2) the trial court erred in failing to hold a competency hearing; (3) the evidence at trial was insufficient to show that he intended to kill anyone; (4) his conviction and death sentence were racially tainted; (5) the practice of Alabama appellate courts of limiting death penalty proportionality review to other death-sentenced cases results in an arbitrary application of the death penalty; (6) electrocution violates the Eighth and Fourteenth Amendments; (7) he was deprived of a fair and impartial jury because a particular juror failed to disclose during voir dire that he knew the sheriff, the deputies involved in the investigation, and the victims;

and (8) he was deprived of a fair trial because a juror injected improper information into the jury deliberations. The district court denied Jones relief. The district court also denied Jones's motion to alter or amend the judgment, but did grant Jones a COA on four claims of ineffective assistance of counsel.

## II. ISSUES

1. Whether Jones was deprived of his Sixth Amendment right to effective assistance of counsel with respect to sentencing counsels' alleged failure to investigate thoroughly and present properly mitigating evidence of Jones's abusive childhood, mental health problems, and intoxication.

2. Whether Jones was deprived of his Sixth Amendment right to effective assistance of counsel because of counsels' failure to object to the trial court's jury instructions relating to the burden of proving malice.

3. Whether Jones was deprived of his Sixth Amendment right to effective assistance of counsel on appeal because of counsel's failure to raise and argue on appeal issues related to the jury instructions on proving malice.

4. Whether Jones was deprived of his Sixth Amendment right to effective assistance of counsel because of counsel's alleged racial bias against him.

## III. STANDARD OF REVIEW

This court reviews for clear error the district court's findings of fact and reviews *de novo* both questions of law and mixed questions of law and fact. *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000). An ineffective assistance of counsel claim is a mixed question of law and fact that the court reviews *de novo*. *See Dobbs v. Turpin*, 142 F.3d 1383, 1386 (11th Cir. 1998). Since Jones's petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), we, in essence, review the decisions of the state courts. Pursuant to AEDPA,

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1), (2). Furthermore, a state court's factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence. *Id.* at 2254(e)(1).

> A state court decision is "contrary to" clearly established federal law if either (1) the state court applied a rule that contradicts the

governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. *See Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000). A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. *See id.* An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. *See id.* Notably, an "unreasonable application" is an "objectively unreasonable" application." *See Williams [v. Taylor]*, 529 U.S. [362], 412, 120 S. Ct. [1495], 1523 [(2000)].

*Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001). Lastly, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000).

## IV. DISCUSSION

The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one. *See Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). In order to establish deficient performance, the petitioner must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. *See Strickland v. Washington*, 466 U.S. 668, 690, 104 S. Ct. 2052, 2066 (1984). The court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate, but only [on] what is constitutionally compelled." *Chandler*, 218 F.3d

11

at 1313 (quoting *Burger v. Kemp*, 483 U.S. 776, 107 S. Ct. 3114, 3126 (1987)).  The court's review of counsel's performance must be highly deferential, and the court must avoid second-guessing counsel's performance.  *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.  If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial – for example, what witnesses he presented or did not present – were acts that some reasonable lawyer might do." *Chandler*, 218 F.3d at 1314-15 n. 15.  Moreover, the courts make an objective inquiry into the reasonableness of counsel's performance.  *Id.* at 1315.  For a petitioner to show deficient performance, he "must establish that no competent counsel would have taken the action that his counsel did take." *Id.*

Lastly, there are no absolute rules dictating what is reasonable performance because absolute rules would restrict the wide latitude counsel have in making tactical decisions.  *See id.* at 1317.  "As such, at a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy." *Putman*, 268 F.3d at 1244.  "Counsel's complete failure to present mitigation evidence does not necessarily constitute deficient performance, even if mitigation evidence is available." *Id.*

In light of these precepts, we will consider each of Jones's claims of ineffective assistance of counsel.

A. *Investigation and presentation of mitigating evidence*

Jones posits that his trial counsel, Jack G. Davis ("Davis"), who represented Jones at both trials, and George M. Boles ("Boles") were ineffective at sentencing for failing to present evidence of his mental illness, his abusive and deprived childhood, and his substance abuse and intoxication on the night of the murders. Jones claims that this mitigation evidence would have established the existence of three statutory mitigating factors and negated two of the aggravating factors argued by the State, and the evidence would have cast substantial doubt on whether Jones had the specific intent required under Alabama's capital murder statute. Jones asserts that his counsel did no mitigation investigation: they did not speak with his family, friends or neighbors; they did not follow up on clear evidence of his mental illness; and they did not request his medical, educational, employment, or correctional records. Jones contends that this total failure to investigate available mitigation evidence was unreasonable in light of local professional standards. Therefore, Jones asserts that he did not receive the effective assistance of counsel guaranteed by the Sixth Amendment.

1. *mental illness*

Jones claims that he is, and was at the time of the crime, psychotic, that he suffers from organic brain damage, and that he is a dependent personality and easily

coerced. Jones asserts that numerous psychiatrists, psychologists and physicians have diagnosed him as psychotic. Jones contends that because his counsel failed to investigate his mental health history, the jury did not know about his psychosis.

With regard to this claim, the trial court made findings of fact following the Rule 32 evidentiary hearing. The trial court noted that Jones presented the testimony of Dr. Brad Fisher, an expert in clinical forensic psychology. Dr. Fisher testified that Jones suffered at the time of the crime and continues to suffer from significant mental conditions, such as dependency, multi-substance abuse, organic impairment, and major thought disorder. In reaching this opinion, Dr. Fisher reviewed Jones's prior court records, family members' affidavits, medical records, and prison records, which consisted of depositions from Dr. Thomas L. Smith and Dr. James C. Thompson in 1979, and the 1979 evaluation by Drs. Thompson and Smith done at Bryce Hospital for the Lunacy Commission. Dr. Fisher also personally evaluated Jones and interviewed family members, such as Maritha Erby (mother), Glen Jones (sister), Henry Erby (half-brother), Phyllis Faevers (half-sister), Johnny Wright (uncle), and Barbara Jones (niece).

The trial court then made the following factual findings:

The record reflects that counsel for petitioner investigated and pursued a mental health defense for the first trial. Petitioner had been evaluated by the Lunacy Commission. Previous counsel, during the first trial, had

14

filed appropriate motions for mental evaluations and had conducted depositions of the mental health experts who evaluated petitioner. The trial court subsequently denied the motion for private psychiatric examination and testing and funds for an expert witness in the field of mental health to perform intelligence and personality tests on the petitioner. Thereafter, petitioner was granted his right to refile his motion for psychiatric examination and said motion was granted.

Subsequently, in preparation for the second trial, Jack Davis filed a motion for expert witnesses including mental health experts and filed a motion for private psychiatric examination and testing. That was denied by the Court on December 7, 1982. This Court finds that counsel in the 1982 trial filed the appropriate motions requesting mental health experts and the appropriate evaluations and tests to be performed upon petitioner and was denied relief by the Court. Petitioner claims that Davis and Boles did not adequately present the testimony available to them as to the mental health of the petitioner and had they presented the available information, they would have been allowed to present the testimony before the jury.

This Court, after having reviewed the records that were reviewed by Dr. Fisher, the testimony of witnesses and the depositions submitted by both parties of the prison physicians that treated the petitioner, finds that the basis for Dr. Fisher's opinion is questionable.

The first area of doubt is the diagnosis of psychosis. It appears that the original diagnosis was made by Dr. Richard Cooksey, a general practitioner for inmates in the prison system. On October 17, 1991, he examined the petitioner for weight loss. Petitioner had a weight-loss problem and Dr. Cooksey, not finding a physical reason for the problem, doubted an organic basis for weight loss and felt that the weight loss was a result of the petitioner just not eating. Petitioner told him that he would not eat anything on his tray if the tray came in contact with anything "unclean." Although in his records he wrote that petitioner admitted auditory hallucinations, the doctor admitted that they were poorly described at the time. The doctor could remember nothing about the nature of the hallucinations. Admitting that he was not a

psychiatrist, the doctor stated, "If he is not eating, he's psychotic. That's pretty much normal day-to-day functioning, eating.". . . He made notes reflecting his diagnosis of petitioner in the medical records of petitioner and recommended that petitioner would be best served at Kilby Correctional Institution where he would get treatment for his mental health.

. . . Therefore, even though the medical records indicate some sort of mental health history, including earlier records of the Lunacy Commission, this Court concludes that there has been no reasonable dependable diagnosis of psychosis to support the opinion of Dr. Fisher, and indeed it appears to this Court that there is no evidence of psychosis.

Although Dr. Fisher states that his testing showed that there is some organicity in the psychosis and other mental problems of the petitioner, there is no evidence to support this opinion. . . . This Court notes that it allowed the petitioner to be tested for any organic basis for mental health problems. Petitioner was transported to a facility which could perform the tests, but no test results or testimony was presented to this Court as to the result of those tests. Therefore, this Court concludes that there is no evidence of an organic basis for any mental health problems the petitioner might have.

The diagnosis of low intelligence is rebutted by testimony of family members who stated the petitioner did well in school and no evidence was presented to contradict that. Although the petitioner quit school before he graduated, he did later obtain his GED, which rebuts any evidence of low intelligence to the point where it would have an effect on the outcome of his trial or sentencing.

. . .

All the testimony as to drug use reflects that the drug use was voluntary and there was no evidence or organic effects of his long-term drug use. Voluntary drug use has never excused or mitigated a crime of this nature in the State of Alabama nor does it in this case.

> After considering the testimony of Dr. Fisher and examining the basis from which he formed his opinion, this Court is of the opinion that there is no credible evidence of significant mental health problems in petitioner.

R. Vol. 8-9, ¶. 1050-1055.

On appeal, the Alabama Court of Criminal Appeals agreed with the trial court's findings.

> We agree with the trial court that the evidence presented by Jones in support of this claim, including the testimony of Dr. Fisher and the depositions and affidavit of other expert witnesses, was not adequate evidence of a mitigating circumstance and was refuted by other testimony and evidence admitted at the hearing and at trial.

*Jones v. State*, 753 So. 2d at 1194. The court also found it significant that the trial court provided Jones with an opportunity to be tested to determine an organic basis for the alleged mental health problems, but Jones admitted no test results at his Rule 32 hearing and relied instead on opinion evidence. *Id.* The court also found significant the finding of the Lunacy Commission that Jones was not suffering from a mental illness at the time of the acts charged that would have prevented him from distinguishing right from wrong. *Id.* at 1194-95. The court concluded that Jones had failed to establish his burden with respect to this claim of ineffectiveness. *Id.* at 1195.

The state courts' determination that Jones did not meet his burden on the claim of ineffective assistance of counsel with regard to the presentation of mental illness mitigation evidence is not an unreasonable application of clearly established law and

17

is not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). As the district court noted, "[m]uch of the evidentiary basis for petitioner's current claim of mental illness arose *after* his trial, during his imprisonment. Certainly, it was not objectively unreasonable for the state courts to discount this evidence that did not exist at the time the trial occurred." District Court Record Vol. 2, Tab 27, p. 49. The information counsel had before them at the 1982 trial was the 1979 Lunacy Commission Report which indicated that Jones did not suffer from a mental illness. Furthermore, Boles testified at Jones's Rule 32 hearing[1] that Jones did not have any problems communicating with him and Davis during trial. *Id.* at 167. Boles stated that he and Davis talked to Jones extensively about the sentencing, and they apparently concluded not to present any psychological or psychiatric testimony at sentencing. *Id.* at 105, 146. Boles emphasized that he relied heavily upon Davis's knowledge of the case because Davis represented Jones at his 1979 trial. *Id.* at 68.

The factual determination made by the state courts is presumed to be correct unless the petitioner can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Robinson v. Moore*, 300 F.3d 1320, 1342 (11th Cir.

---

[1] Jones's other counsel, Jack Davis, did not testify at the post-conviction hearing because he is deceased.

2002), *cert. denied*, *Robinson v. Crosby*, 540 U.S. 1171, 124 S. Ct. 1196 (2004). Jones presents no evidence to rebut the state courts' finding that Boles and Davis were not ineffective for failing to present at sentencing any evidence of Jones's alleged mental illness. At the time of trial, they did not have any evidence to indicate any potential mental illness, and instead, had a Lunacy Commission Report that stated to the contrary. Boles also stated that Jones had no problems communicating with him and Davis during trial, and he and Davis discussed whether to present mental health testimony at sentencing and concluded not to present such testimony. In light of this, we cannot say that the state courts' finding that Jones's counsels' performance was not deficient was an unreasonable determination of the facts.

### 2. *abusive childhood*

Jones contends that his counsel were ineffective because they did not present in mitigation any evidence of his abusive childhood. Jones asserts that the state courts' determination that the evidence of abuse was negligible was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

The trial court found as follows concerning Jones's alleged abuse:

Petitioner's sister, Glen Jones, testified to abuse by their father. She testified that her father was rarely around but when he did come that he would make petitioner and Glen take off their clothes, would tie them

19

to a door knob and beat them with a cord. She testified that the beatings with a cord were so severe that wire from the extension cord was embedded in their flesh. The Court concludes that this is an exaggeration and that had this abuse occurred there would be some obvious scarring from where such young children were beaten to the point where the insulation of an extension cord was torn off and wire was embedded in their skin. The other evidence of abuse is negligible.

The opinion of Dr. Fisher as to the effects upon petitioner of this "abusive childhood" is rebutted by other family members that testified, including Glen Jones. Their testimony suggests that, although petitioner had to live with relatives and was beaten by his father and had other problems with family members, he adjusted well. Petitioner made good grades in school and had no trouble with teachers. He was helpful to people and was polite and well behaved. He was able to maintain employment and although he had a few problems with attendance, was generally considered to be a good worker. Petitioner attended church and played in the school band. He was not a violent person growing up.

R. Vol. 8-9, ¶. 1053-54.

The trial court further noted that seven of Jones's family members testified at the Rule 32 hearing regarding Jones's childhood and upbringing. The trial court concluded that the evidence presented by the family members did not establish any mitigating circumstances that would have changed the outcome of Jones's sentence. In so concluding, the trial court noted that it was "easy to see why counsel would be reluctant to call Glen Jones for the second trial after hearing her testimony from the first trial." R. Vol. 9, p. 1059.

The petitioner was at her house the night of the murders. The sister testified that prior to leaving with Giles to go to the Nelsons, Jones was

20

shooting drugs in her house. She did not question or object to the use of drugs by her brother in her house with her children present. She also testified as to the extent that everybody was intoxicated or high, which was inconsistent with her testimony that she allowed no one but her brother to use drugs in her home. Her testimony as to how Giles talked Jones, the petitioner, into going to the Nelsons, shows that there was not much coercion utilized by Giles. He simply asked Jones more than once to go and Jones agreed. This testimony would have seriously prejudiced the petitioner in the trial of this case and since petitioner was convicted in his 1979 trial, trial counsel in the 1982 trial had good reason to avoid using Glen Jones as a witness.

*Id.* at 1059-60. The court provided further assessment of the family members'

testimony:

The mitigating evidence presented by the petitioner shows no more than a child of a broken family that had positive and negative influences in his life but chose to follow the friends that he grew up with that were taking drugs. From the testimony of these witnesses it is apparent that petitioner had the ability to do well in school, had people in whom he could confide and by whom he could be advised, was involved in church activities such as choir and other extracurricular activities such as playing in the school band. The petitioner's temperament was peaceful and the only negative influence appears to be the influence of his friends who used drugs.

Aaron Jones had the abilities and the opportunities to make the choices that everyone has to make in life and made the incorrect choice. When Aaron Jones started using drugs his life changed. His mitigation is that the drugs made him commit the crime. Frequently this has been interposed as a defense and as mitigation but it has never been accepted as an excuse to mitigate this type of crime.

The testimony of these witnesses is unconvincing. Had it been presented to the jury it would not establish mitigation for the acts of the petitioner.

21

*Id.* at 1062.

After reviewing the testimony of Jones's family members and friends, the Alabama Court of Criminal Appeals agreed with the trial court's finding. The court concluded that "none of their testimony supported a finding of a mitigating circumstance recognized by § 13A-5-51, Ala. Code 1975, and would not have changed the balance of the mitigating and aggravating circumstances in Jones's case." *Jones v. State*, 753 So.2d at 1196-97. The court further noted that because there was no error in the trial court's determination that the evidence would not have changed the outcome of Jones's trial, it could not say that Jones's trial counsel were ineffective for failing to present the testimony of Jones's family members and friends. *Id.* at 1197. "Jones has not established a reasonable probability that but for his counsel's failure to call these witnesses and present the alleged mitigating evidence during the sentencing phase of his trial that the outcome of the sentencing proceeding would have been different." *Id.* Thus, the appellate court agreed with the trial court's ruling that Jones's counsel were not ineffective in failing to call these family members to testify at sentencing. *Id.*

Based upon our review of the entire record, we conclude that the Alabama courts properly found that Jones's attorneys were not ineffective in failing to present evidence at sentencing about his abusive childhood and upbringing. The testimony

22

at the Rule 32 hearing indicates that other than Glenn Jones's testimony, the evidence of abuse was negligible. Additionally, Glen Jones's testimony was contradictory and potentially more harmful than helpful. Furthermore, Boles testified that he recalled that Davis talked to family members and mentioned that there was some problem or estrangement within the family. R. Vol. 1, p. 102. In light of this, we cannot say that the Alabama courts' determination is contrary to or involves an unreasonable application of federal law as determined by the Supreme Court. Nor can we say that the state courts' decision is based on an unreasonable determination of the facts that were presented during the state court proceedings.

*3. substance and alcohol abuse*

Jones asserts that his attorneys were ineffective because they failed to present evidence that he was suffering from a toxic psychosis on the night of the murders and was not able to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The trial court noted Glen Jones's testimony that Jones had been drinking and doing drugs the night of the murder in its consideration of the possible mitigation evidence counsel should have presented at sentencing. The trial court, however, did not single out this issue as one of ineffectiveness, nor did the Alabama Court of Criminal Appeals. The portion of the state court opinion that Jones

attacks deals with counsels' failure to present intoxication as a defense during the guilt phase of the trial. *See Jones v. State*, 753 So.2d at 1190-91.

The district court considered this issue and found that counsel were not ineffective for failing to present evidence of Jones's intoxication in mitigation. The district court noted that evidence of Jones's drug use was presented to the jury during the guilt stage. Witnesses testified at the 1982 trial that Jones appeared drunk, and Jones admitted in his confession that he had been drinking heavily the day of the murder, and that he was "so far gone" that he stabbed wildly. The district court concluded that there was no reason to believe that the jury failed to consider this guilt stage testimony for whatever mitigating power it had during the sentencing stage. District Court Record, Vol. 2, Tab 27, ¶. 41-42.

Because Jones did not raise this specific claim of ineffective assistance of counsel in state court, the claim is procedurally barred. *See Johnston v. Singletary*, 162 F.3d 630, 634-35 (11th Cir. 1998). Assuming *arguendo* that Jones raised in state court the specific claim that counsel were ineffective for failing to present evidence of his toxic psychosis in mitigation, the claim lacks merit. The only evidence Jones proffers to support his claim is the affidavit of Dr. Davis. Dr. Davis opined that Jones was suffering from toxic psychosis on the night of the murders; however, Dr. Davis's affidavit was submitted after the Rule 32 hearing, and the State had no opportunity

24

to cross-examine him. Because Jones fails to present any credible evidence to support his claim of toxic psychosis, he cannot show that his counsel were ineffective for failing to present this alleged evidence in mitigation.

*4. prejudice*

Jones cannot demonstrate that his counsels' performance at sentencing was deficient. Nor can Jones demonstrate that he was prejudiced by counsels' failure to present the mitigating evidence of Jones's alleged mental illness, his abusive childhood, and his alleged toxic psychosis. As noted earlier, the Alabama state courts correctly found that the evidence submitted by Jones during his state post-conviction proceeding was not mitigation evidence that would have changed the outcome of his sentencing. The Alabama Court of Criminal Appeals applied the proper prejudice standard under *Strickland* and found that Jones did not establish "a reasonable probability that but for his counsel[s'] failure to call these witnesses and present the alleged mitigating evidence during the sentencing phase of his trial that the outcome of the sentencing proceeding would have been different." *Jones v. State*, 753 So.2d at 1197. The court considered the totality of the alleged mitigation evidence and concluded that "because we have determined that evidence of Jones's alleged mental illness, the forensic evidence, and the testimony of family and friends would not have

established a mitigating circumstance, we cannot hold that Jones's trial counsel [were] ineffective for failing to present this evidence." *Id.*

Given the heinousness of the crime and the overwhelming evidence of Jones's guilt, there simply is no reasonable probability that counsels' failure to present evidence of Jones's alleged mental health problems, his abusive childhood, and his excessive drinking on the night of the murders prejudiced Jones. Jones, armed with a gun, went with Giles to rob the Nelsons. Once inside the house, Jones stabbed three of the four victims, two of whom died from these injuries. Moreover, Jones stabbed the victims in front of their two children, while one child begged him to stop. Jones also stabbed one of the children in the back. In light of this evidence, there is no reasonable probability that the outcome of the sentencing proceeding would have been different had counsel presented this mitigation evidence. Accordingly, Jones is not entitled to relief on these claims of ineffective assistance of counsel.

B. *Objection to malice instruction*

Jones contends that his counsel were ineffective for failing to object to an improper burden-shifting charge on malice. Jones asserts that the jury instruction on the element of malice created a mandatory presumption that relieved the State of its burden of persuasion and shifted the burden to him. The trial court instructed the jury as follows:

26

Now, we have [a] statute which defines murder in the first degree. This statute says that every willful, deliberate, malicious and premeditated killing of a human being is murder in the first degree. Now I will undertake to define these four terms for you in order that you may better understand them, and in doing so, will use the language used by the Supreme Court many years ago.

Willful means governed by the will without yielding to reason. Deliberate means formed with deliberation in contradistinction to a sudden and rash act. Malice means done with a fixed hate or wicked intention or a motive, not the result of a sudden passion. That is the definition of actual malice. But the word malice, as used in this statute which defines murder, has a broader meaning than that. It includes, not only actual malice, but includes what we call legal or implied malice. And in the broader sense, it means the state or condition of the mind which prompted a person to do an unlawful act without legal justification or extenuation.

Now every intentional and unlawful killing of a human being is presumed to be done with malice aforethought unless the circumstances that surround the killing rebut the idea of malice. Every intentional and unlawful killing of a human being with a deadly weapon, such as a pistol or with a knife, is presumed to be done with malice unless the evidence that proved the killing rebuts the presumption of malice.

R. Vol. 7, ¶. 683-85.

On appeal from the trial court's denial of post-conviction relief, the Alabama Court of Criminal Appeals concluded that the instruction did not require the jury to infer or presume the element of malice aforethought in the absence of evidence from Jones that such a presumption was unwarranted. *See Jones v. State*, 753 So.2d at 1189. In so concluding, the court noted that "the predicate fact supporting the

27

presumption is Jones's intentional and unlawful killings of the victims with a deadly weapon, i.e., a knife." *Id.* at 1188. The jury was to presume from the proof of the killings that Jones committed the murders with malice aforethought. "However, in order for the jurors to reach that conclusion, the State had to prove that Jones killed the victims intentionally and that the circumstances of the killings evidenced that Jones acted with malice aforethought." *Id.* The court found that the instruction did not shift the State's burden to establish the element of malice. *Id.* at 1188-89 (relying on *Francis v. Franklin*, 471 U.S. 307, 314, 105 S. Ct. 1965, 1971 (1985)). The court further noted that the trial court also gave a charge concerning Jones's presumption of innocence and the State's burden of proof. Thus, the court found that in considering the jury charge in its entirety, any error was cured by the additional charges. *Jones*, 753 So.2d at 1189. Accordingly, the court concluded that "[b]ecause Jones ha[d] failed to establish that the trial court's instruction on malice constituted error, he ha[d] failed to show that his trial counsel w[ere] ineffective for failing to challenge this instruction." *Id.*

The district court agreed with the Alabama Court of Criminal Appeals that the instruction on malice did not relieve the State of its burden of proving every element of capital murder. However, the district court expressed some concern with the state appellate court's reasoning in addressing this issue. In a footnote, the district court

28

stated that the state appellate court concluded that the instruction in this case involved merely a permissive inference, not a mandatory presumption. In *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450 (1979), and *Francis v. Franklin*, 471 U.S. 307, 105 S. Ct. 1965 (1985), the Supreme Court cautioned that the words "presume" or "presumption" imply a mandatory finding, not merely a permissive inference the jury may or may not draw. *Francis*, 471 U.S. at 316. Thus, the district court found it difficult to say that the conclusion reached by the state appellate court was not "contrary to" *Francis*. District Court Record Vol. 2, Tab 27, p. 83-84 n. 14. Likewise, the district court noted that the state appellate court concluded that the general instruction about the defendant's presumption of innocence and the State's burden of proof cured any defect in this particular instruction on malice. The district court noted that both *Sandstrom* and *Francis* rejected the notion that such general instructions are adequate to cure a specific burden-shifting instruction. Thus, the district court found that the state appellate court's reasoning was "contrary to" *Francis*. *See id.*

However, the district court agreed that Jones did not receive ineffective assistance due to counsels' failure to object to the malice instruction. The district court concluded that the instruction did not really relieve the State of the burden of proving all elements of the offense of capital murder; and second, if the instruction

29

was error, it was harmless error in light of the overwhelming evidence against Jones.

Thus, under either rationale, counsels' failure to object to the instruction did not

prejudice Jones. The district court concluded:

> Alabama law defines malice in this context as "the state or condition of the mind which prompted a person to do an unlawful act without legal justification or extenuation." Under the court's instruction, the jury "presumed" malice, that is, that the murders were done with a recognition that they were "without legal justification or extenuation," only after finding first that the killings were "intentional and unlawful." The state always retained the burden of proving both that the killings were intentionally done by petitioner and that they were unlawfully done by him. The jury's finding that the killings were intentional and unlawful was, in effect, a finding of malice, notwithstanding the presumption contained in the instruction.

> Finally, coupling the explicit placement of the burden of proving intentional and unlawful killings on the state with the concluding phrase of the instruction that malice is presumed "unless the evidence that proved the killing rebuts the presumption of malice," it becomes apparent that the instruction always required the State's evidence to prove malice. If the "evidence that proved the killing," that is, the State's evidence, failed to show malice, then the presumption was rebutted. The instruction never required the petitioner to offer any rebutting evidence; rather, it lay entirely in the State's burden of proof. Thus, the instruction did not shift the burden to the petitioner and, therefore, was not objectionable.

> Even if the instruction can be regarded as a burden-shifting instruction in violation of *Sandstrom* and *Francis*, the error in this case was harmless. *See Rose v. Clark*, 478 U.S. 570, 106 S. Ct. 3101 (1986). The overwhelming evidence against petitioner showed that he went to the Nelson home with Giles for the purpose of robbing them. He was armed with a gun and, when the gun proved unusable, he stabbed the Nelsons multiple times with a butcher knife retrieved from their kitchen. There

30

can be no reasonable doubt that petitioner acted with the requisite malice, that is, recognition that he acted without legal justification or extenuation. As the malice instruction constituted harmless error, counsel's failure to object to it does not undermine confidence in the outcome of petitioner's trial; his trial remained fundamentally fair, despite this error. Thus, without prejudice, there was no ineffective assistance of counsel, and petitioner is not entitled to relief on this claim.

District Court Record Vol. 2, Tab 27, p. 85-87.

We agree with the district court that trial counsel did not render ineffective assistance by failing to object to the jury charge on malice. The trial court's charge on malice meant an intentional killing. As the state appellate court noted, "the predicate fact supporting the presumption is Jones's intentional and unlawful killings of the victims." *Jones*, 753 So. 2d at 1188. Furthermore, even if the instruction was error, any error was harmless in light of the overwhelming evidence of Jones's guilt. *See Rose v. Clark*, 478 U.S. 570, 106 S. Ct. 3101 (1986).

In *Yates v. Evatt*, 500 U.S. 391, 111 S. Ct. 1884, 1892 (1991), the Supreme Court described the nature of the harmless error analysis which must be applied to *Sandstrom* errors:

To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the

31

presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

111 S. Ct. at 1893.[2] The Court then set forth two distinct steps for the reviewing court to follow in performing this analysis: first, the court must analyze the jury instructions, applying the customary presumption that jurors follow instructions; second, the court must weigh the probative force of the evidence actually considered by the jury against the probative force of the presumption standing alone. *Id.* The Court then noted that conclusions of harmless error are not appropriate simply because there is overwhelming evidence of the defendant's guilt. This overwhelming evidence must have been considered by the jury. Thus, a reviewing court must determine "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Id.* at 1893-94.

Weighing the probative force of the evidence of guilt against the probative force of the presumption standing alone, there is no doubt in our minds that the verdict resting on that evidence would have been the same in the absence of the

---

[2] We acknowledge that the Supreme Court has disapproved of some of the *Yates* language, but the *Yates* harmless error analysis remains applicable. *See Stevens v. Zant*, 968 F.2d 1076, 1086 n.12 (11th Cir. 1992).

32

presumption. *See id.* The jury considered the testimony of the surviving victims, and Jones's confession to his participation in the crimes. Jones acknowledged that he went to the Nelsons' home armed with a gun with the intent to rob the victims. Jones admitted that he stabbed the victims multiple times with a butcher knife. Jones also acknowledged that one of the children begged him to stop, and that the female victim moved before he stabbed her. There can be no doubt that "the verdict resting on [this] evidence would have been the same in the absence of the presumption." *Id.* at 405, 111 S. Ct. at 1893-94.

Therefore, we conclude that Jones cannot establish that his counsel were deficient for failing to object to the trial court's instruction or that counsels' failure to object to the instruction undermined confidence in the outcome of his trial. Accordingly, Jones is not entitled to relief on this claim of ineffective assistance of counsel.

C. *Appellate counsel*

The district court included within the COA the issue of whether Jones received ineffective assistance of appellate counsel because counsel failed to raise on appeal a challenge to trial counsels' failure to object to the trial court's malice instruction. Neither Jones nor the State briefed this issue or argued it before the court. Thus, we deem the argument abandoned. *See Marek v. Singletary*, 62 F.3d 1295, 1298 n.2

(11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.");

*see also Access Now, Inc. v. Southwest Airlines, Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("If an argument is not fully briefed (let alone not presented at all) to the Circuit Court, evaluating its merits would be improper both because the appellants may control the issues they raise on appeal and because the appellee would have no opportunity to respond to it.").

However, even if we considered the issue, we would not grant Jones relief on this claim. As we stated previously, Jones's trial counsel were not ineffective in failing to object to the malice jury instruction. Thus, it is *a fortiori* that Jones's appellate counsel was not ineffective in failing to raise the issue on appeal.

D. *Racial animus*

Jones contends that Boles harbored racial animosity toward him that infected his entire representation of Jones and deprived Jones of his Sixth Amendment right to effective assistance of counsel. Our review of the record indicates that Jones did not raise this claim as a specific, enumerated claim of ineffective assistance of counsel in his federal habeas petition. Instead, he referenced the issue in the introductory portion of his federal habeas petition. Additionally, Jones did not raise this as an enumerated claim of ineffectiveness in state court in his Rule 32 petition. Rather, during the Rule 32 hearing, Jones presented testimony from Ann Graham, the

34

legal secretary for Jones's post-conviction counsel, that Boles told her in a phone conversation something to the effect of "that nigger is going to fry." R. Vol. 2, p. 378. In his "Proposed Findings of Fact and Conclusions of Laws" filed on May 14, 1996, after the trial court conducted the Rule 32 hearing, Jones stated that "[i]n addition, attorney Boles' general racial attitudes and, specifically, his racial attitudes as to his client, the Petitioner, fatally impaired his ability to provide effective assistance of counsel." R. Vol. 4, p. 233. On appeal of the trial court's denial of his motion for post-conviction relief, Jones asserted that "the root of his ineffective-assistance-of-counsel claims is what he says are Boles's racist views." *See Jones*, 753 So. 2d at 1182.

These general references to a "claim" of ineffectiveness based on Boles's alleged racial animosity do not fairly present the claim to the courts. Although Jones presented limited testimony on this allegation in his Rule 32 proceeding, mentioned it briefly in his post-Rule 32 filings, and noted the allegation in his introductory and conclusory portions of his state appellate brief, there is absolutely no discussion by any state court of the allegation. The state trial court did not address it in its Rule 32 order because Jones did not raise the allegation in his Rule 32 petition. Nor did the state appellate court review the merits of this "claim" because Jones did not raise it as a discrete claim of ineffective assistance of counsel on appeal from the trial court's

35

denial of his Rule 32 petition. Rather, the state appellate court made one statement mentioning Jones's assertion that the root of his ineffectiveness claims was Boles's racial animosity. Because this "claim" was not fairly presented to the state courts, it is procedurally defaulted, *see Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971), and we will not consider it. *See Teague v. Lane*, 489 U.S. 288, 297-98, 109 S. Ct. 1060, 1068-69 (1989).

A petitioner may obtain federal review of a procedurally defaulted claim if he can show both cause for the default and actual prejudice resulting from the default. *Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497 (1977). Additionally, in extraordinary cases, a federal court may grant a habeas petition without a showing of cause and prejudice to correct a fundamental miscarriage of justice. *See Murray v. Carrier*, 477 U.S. 478, 106 S. Ct. 2639 (1986). Jones has not attempted to meet either exception.

Furthermore, we decline to consider the merits of this claim because Jones did not clearly present this issue to the district court as a specific, enumerated claim of ineffective assistance of counsel. As a general rule, we will not address issues or arguments on appeal that were not fairly presented to the district court. *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991).

Assuming the issue was properly before us for consideration, we would conclude that the claim is without merit. Boles's alleged racial remarks occurred almost 13 years after Jones's trial. Jones did not present any evidence that Boles made any racist statements to Jones during his representation. There is no evidence that Boles ever made a derogatory racial remark to Jones. The alleged racial remark was made to a legal secretary, not to Jones, and the alleged comment was made after Boles's representation of Jones. There is no evidence to support Jones's allegation that Boles's alleged racist attitude toward him affected Boles's representation to the extent that Jones was denied the right to counsel guaranteed by the Sixth Amendment. Accordingly, Jones is not entitled to relief on this claim.

## V. CONCLUSION.[3]

Jones has not shown that his counsel rendered ineffective assistance to him at either his trial or sentencing. Jones cannot establish that in light of all the circumstances, his counsels' performance was outside the wide range of professional competence. Jones also cannot establish that his counsels' alleged deficient

---

[3] We note that in addition to his request for relief from his conviction and sentence, Jones urges this court to remand his case with directions that the district court conduct an evidentiary hearing on his mental health claims. Jones is not entitled to an evidentiary hearing because he had ample opportunity to develop the factual basis of this claim in state court. *See* 28 U.S.C. § 2254(e)(2); *see also Kelley v. Sec'y Dep't of Corr.*, 377 F.3d 1317, 1337 (11th Cir. 2004).

performance prejudiced the outcome of his trial or sentencing. Accordingly, we affirm the district court's judgment denying Jones habeas relief.

AFFIRMED.